> **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE DEBTORS' PLAN.  ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THE PLAN IS SUBJECT TO CHANGE.  THE PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MAINES PAPER & FOOD SERVICE, INC., *et al.*,[1] | Case No. 20-11502 (KBO) |
| Debtors. | (Joint Administration Requested) |

## DISCLOSURE STATEMENT WITH RESPECT TO DEBTORS' JOINT PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware  19899-8705 (Courier 19801)
Telephone:  302-652-4100
Facsimile:  302-652-4400
email:   ljones@pszjlaw.com
          dbertenthal@pszjlaw.com
          tcairns@pszjlaw.com

[Proposed] Counsel for Debtor and Debtor in Possession

Dated:  June 11, 2020

---

[1] The Debtors, along with the last four (4) digits of each Debtor's federal tax identification number are: Maines Paper & Food Service, Inc. (7759); Maines Funding Corporation (2136); Maines Paper & Food Service - Chicago, Inc. (9916); Maines Paper & Food Service - Dallas, Inc. (8533); Maines Paper & Food Service - Great Lakes, Inc. (3029); Maines Paper & Food Service - Maryland, Inc. (2317); Maines Paper & Food Service - Mid-Atlantic, Inc. (3028); Maines Paper & Food Service - New England, Inc. (3026); Maines Paper & Food Service - NY Metro, Inc. (3024); Maines Paper & Food Service - Ohio, Inc. (3023); Maines Paper & Food Service - Tennessee, Inc. (5934); Maines Paper & Food Service - Worcester, Inc. (1866); and Warehouse & Logistics, Inc. (5921).  The Debtors' business address is 101 Broome Corporate Parkway, Conklin, New York 13748.

DOCS_LA:329251.9 54433/001

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................. 1
A.  Solicitation Packages ...................................................................................... 3
B.  Only Impaired Classes Vote ........................................................................... 4
C.  Voting Procedures............................................................................................ 4
D.  Plan Objection Deadline ................................................................................. 5
E.  Confirmation Hearing ..................................................................................... 5
F.  Overview of the Plan ....................................................................................... 5
II. BACKGROUND AND CHAPTER 11 CASES................................................... 7
A.  Debtors' History and Formation ..................................................................... 8
B.  Debtors' Corporate and Capital Structures ..................................................... 9
1.  Corporate Structure ......................................................................................... 9
2.  Prepetition Capital Structure........................................................................... 9
    a.  Prepetition Indebtedness ......................................................................... 9
        b.  Term Credit Agreement ..................................................................... 10
        c.  Darden Note ....................................................................................... 10
        d.  M&T Note........................................................................................... 11
        e.  Trade Debt ......................................................................................... 11
3.  Changes in the Board of Directors / Management ........................................ 11
C.  Prepetition Sale Process and Events Culminating in the Foreclosure
    and Bankruptcy Cases .................................................................................... 12
    1.  First Day and Cash Collateral Relief ................................................... 14
III. SUMMARY OF THE PLAN ........................................................................... 15
A.  General ........................................................................................................... 15
B.  Classification and Treatment of Claims and Equity Interests....................... 15
    1.  Unclassified Claims .............................................................................. 15
    2.  Classification and Treatment of Claims and Equity Interests.............. 16
C.  Means for Implementation of the Plan.......................................................... 18
    1.  No Substantive Consolidation.............................................................. 18
    2.  Dissolution of Debtors ......................................................................... 19
    3.  Appointment of the Liquidating Trustee.............................................. 19
    4.  The Liquidating Trust ........................................................................... 19
    5.  Rights and Powers of the Liquidating Trustee..................................... 20
    6.  Fees and Expenses of the Liquidating Trust ........................................ 20
    7.  Transfer of Beneficial Interests in the Liquidating Trust.................... 21
    8.  Available Cash ...................................................................................... 21
    9.  Litigation .............................................................................................. 21
    10.  [Dissolution of the Committee............................................................ 21
    11.  Full and Final Satisfaction ................................................................. 22
    12.  Distribution Procedures ..................................................................... 22
    13.  Liquidating Trust Assets Account ...................................................... 23
    14.  Resolution of Disputed Claims ........................................................... 23
    15.  Reserve Provisions for Disputed Claims ............................................ 25
D.  Unexpired Leases and Executory Contracts ................................................. 25

E.    Conditions to Confirmation of the Plan .......................................................... 26
F.    Conditions to Effectiveness ....................................................................... 26
G.    Effects of Confirmation .......................................................................... 27
H.    Preservation of Rights of Action.................................................................. 31
I.     No Discharge .................................................................................... 32
J.    Retention of Jurisdiction ......................................................................... 32
IV. VOTING REQUIREMENTS; ACCEPTANCE AND
      CONFIRMATION OF THE PLAN ............................................................. 32
A.    Parties in Interest Entitled to Vote ................................................................ 33
B.    Classes Impaired Under the Plan .................................................................. 33
C.    Voting Procedures and Requirements.............................................................. 33
D.    Confirmation Standards ........................................................................... 34
E.    Best Interests Test ................................................................................ 35
F.    Liquidation Analysis .............................................................................. 35
G.    Feasibility......................................................................................... 36
H.    Acceptance by Impaired Classes. .................................................................. 36
I.     Compliance with the Applicable Provisions of the Bankruptcy Code .............................. 38
V. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ... 38
VI. RISK FACTORS ...................................................................................... 38
A.    Risks Relating to Confirmation and Consummation of the Plan .................................... 39
   1.    Parties in Interest May Object to Classification of Claims and Interests ................... 39
   2.    The Debtors May Object to a Claim or Equity Interest ................................... 39
   3.    The Debtors May Fail to Satisfy the Vote Requirement.................................. 39
   4.    Plan May Not Be Accepted, Confirmed or Consummated.............................. 39
   5.    Non-Consensual Confirmation of the Plan May Be Necessary.......................... 40
B.    Risks Relating to the Chapter 11 Process .......................................................... 41
   1.    The Debtor's Exclusivity Period May Terminate ....................................... 41
   2.    Continuation of the Chapter 11 Cases May Harm the Debtors' Estates.................. 41
   3.    The Chapter 11 Cases May Be Converted to Cases Under Chapter 7.................... 41
C.    Risks Relating to Recoveries Under the Plan ...................................................... 41
VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................. 42
A.    Federal Income Tax Consequences to Certain Creditors........................................... 42
   1.    In General............................................................................. 42
   2.    Non-United States Persons ............................................................ 43
   3.    Tax Consequences in Relation to Liquidating Trust.................................... 43
B.    Information Reporting and Backup Withholding ................................................... 46
VIII. RECOMMENDATION................................................................................ 46

# I.

# **INTRODUCTION**

Maines Paper and Food Service, Inc. and its debtor affiliates (the "Debtors" or "Maines") have filed their proposed *Debtors' Joint  Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code*, dated June 11, 2020 (as may be amended or modified, the "Plan"), with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  A copy of the Plan is attached hereto as **Exhibit A**.[2]  The Debtors hereby submit this Disclosure Statement with respect to the Plan (as may be amended or modified, the "Disclosure Statement"), pursuant to Section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances or rejections of the Plan from certain Holders of Claims against the Debtors.

[On _____, 2020, the Court entered the *Order (I) Approving the Disclosure Statement; (II) Scheduling a Plan Confirmation Hearing and Approving Deadlines Related Thereto; (III) Approving Solicitation Packages and Procedures; (IV) Approving the Form of Ballot; and (V) Granting Related Relief* [Docket No. _____], which granted approval of the Disclosure Statement and approved of the forms of Plan ballots and notices, as well as set _____, 2020, at __:____ __.m. **(Eastern Time)** as the time for the hearing to confirm the Plan.] [SUBJECT TO COURT APPROVAL]

If confirmed and consummated, the Plan will facilitate the orderly wind down of the Debtors' remaining business, including formation of a liquidating trust to pursue any remaining causes of action, liquidate remaining assets, and distribute all proceeds according to the Plan, among other things before finally closing these cases.  As discussed further herein, the Debtors recently completed a prepetition foreclosure process, through which substantially all of the Debtors' assets were foreclosed upon by Lineage Bluebird Debtco, LLC ("Lineage") pursuant to the Strict Foreclosure Agreement (defined below).  The Strict Foreclosure Agreement, among other things, provides for the set-aside of $2 million for distribution to holders of general unsecured claims upon consummation of a plan of liquidation and the approval of the plan releases in favor of Lineage.  This $2 million GUC Fund provided by Lineage will be the primary source of recovery for general unsecured creditors (Class 6 under the Plan), and such distributions would otherwise **not** be available under the Debtors' circumstances, or in a Chapter 7 proceeding.

The Debtors seek Bankruptcy Court approval of the Plan.  Before soliciting acceptances of a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a chapter 11 plan.  This Disclosure Statement is being submitted in accordance with such requirements.  This Disclosure Statement includes, without limitation, information about:

---

[2] Capitalized terms used herein that are not otherwise defined herein shall have the meanings ascribed to them in the Plan.

- the Debtors' corporate history and corporate structure, business operations, and prepetition capital structure and indebtedness (Article II);
- events leading to the Chapter 11 Cases, including the Debtors' restructuring and sale/transaction negotiations (Article II);
- significant events in the Chapter 11 Cases (Article II);
- the classification and treatment of Claims and Interests under the Plan (Article III); including who is entitled to vote and how to vote on the Plan (Article IV);
- certain important effects of Confirmation of the Plan (Articles VI and VII);
- releases contemplated by the Plan (Article III);
- the statutory requirements for confirming the Plan (Article IV);
- certain risk factors Holders of Claims should consider before voting to accept or reject the Plan and information regarding alternatives to Confirmation of the Plan (Article V and VI); and
- certain United States federal income tax consequences of the Plan (Article VII).

In light of the foregoing, the Debtors believe this Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code. Pursuant to Section 1125(a)(1) of the Bankruptcy Code, "adequate information" is defined as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan."

All creditors entitled to vote to accept the Plan should return their Ballots (as defined herein), so as to be **actually received** by the Claims Agent no later than _____, **2020, at 4:00 p.m. prevailing Eastern Time**. Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

The Plan and all documents to be executed, delivered, assured, and/or performed in connection with the consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan).

**NOTHING CONTAINED IN THIS DOCUMENT SHALL CONSTITUTE AN OFFER, ACCEPTANCE, OR A LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST, SINCE THIS DISCLOSURE STATEMENT AND THE PLAN IT SUPPORTS REMAINS, *INTER ALIA*, SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT.  THE INFORMATION CONTAINED HEREIN IS PRELIMINARY AND DEVELOPMENTS MAY OCCUR THAT REQUIRE MODIFICATIONS OR ADDITIONS TO, OR DELETIONS FROM, THIS DISCLOSURE STATEMENT AND THE PLAN IT SUPPORTS.  THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT.**

THIS DISCLOSURE STATEMENT AND THE PLAN IT SUPPORTS ARE THE ONLY DOCUMENTS THAT CREDITORS AND OTHER PARTIES IN INTEREST SHOULD CONSIDER IN CONNECTION WITH CONFIRMATION OF THE PLAN, INCLUDING, WITHOUT LIMITATION, THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN.  NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED, OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT.  ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

APPROVAL OF THE DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT INDICATE THAT THE BANKRUPTCY COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN, NOR DOES SUCH APPROVAL CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT.

THE DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN.  EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.  AFTER CAREFULLY REVIEWING THESE DOCUMENTS, IF YOU ARE A CLAIM HOLDER ENTITLED TO VOTE, PLEASE INDICATE YOUR VOTE WITH RESPECT TO THE PLAN ON THE ENCLOSED BALLOT AND RETURN IT IN THE ENVELOPE PROVIDED.

A.    **Solicitation Packages**

On _____, 2020, the Bankruptcy Court entered an order approving the Disclosure Statement (the "Disclosure Statement Order").  Holders of Claims who are eligible to vote to accept or reject the Plan will receive appropriate solicitation materials (collectively, the "Solicitation Package"), including:

- the Disclosure Statement, as approved by the Bankruptcy Court (with all exhibits thereto);
- the Plan (Exhibit A to the Disclosure Statement);
- the Disclosure Statement Order (without exhibits thereto);
- the Solicitation Procedures;
- the Combined Hearing Notice;
- an appropriate Ballot with voting instructions with respect thereto, together with a pre-addressed return envelope;
- a cover letter from the Debtors (1) describing the contents of the Solicitation Package, and (2) urging the Holders of Claims in the Voting Classes to vote to accept the Plan; and

- any supplemental documents the Debtors may file with the Bankruptcy Court prior to solicitation or that the Bankruptcy Court orders to be made available.

**B.**    **Only Impaired Classes Vote**

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims and Equity Interests that are "impaired" under the Plan may vote to accept or reject the Plan.  Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan.  In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under the Plan on account of such claims or interests, such impaired class is deemed to have rejected the Plan and shall not be afforded an opportunity to vote to accept or reject the Plan.

Under the Plan, Claims and Equity Interests in Classes 2, 3, 4, 6, 7 and 8 are Impaired.  However, Class 3 (Darden Note Secured Claims) and Class 4 (Term Loan Guarantee Claims) are deemed to vote for the Plan, and Class 7 (Intercompany Claims) consents to the Plan.  Holders of Equity Interests in Class 8 will receive no distribution, and, accordingly, such Equity Interest holders are deemed to reject the Plan.  ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 2 (ABL SECURED CLAIMS) AND CLASS 6 (UNSECURED CLAIMS).

**C.**    **Voting Procedures**

The deadline to vote on the Plan is _____, **2020, at 4:00 p.m., prevailing Eastern Time** (the "Voting Deadline").  All votes to accept or reject the Plan must be received by the Debtors' voting agent, Stretto (the "Voting Agent") by the Voting Deadline.

Ballots must be actually received by the Voting Agent by the Voting Deadline at the following address, whether sent by first class mail, personal delivery, or overnight courier:

**Maines Ballot Processing Center**
**c/o _____**
_____
_____

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by using the appropriate ballot.  All ballots must be properly executed, completed, and delivered according to their applicable voting instructions by: (a) first class mail, in the return envelope provided with each ballot; (b) overnight delivery; or (c) personal delivery, so that the ballots are actually received by the Voting Agent no later than the Voting Deadline at the return address set forth in the applicable ballot.  Any ballot that is properly executed by the Holder of a Claim entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.  Ballots received by facsimile or by electronic means will not be counted.

Each Holder of a Claim entitled to vote to accept or reject the Plan may cast only one ballot for each Claim held by such Holder.  By signing and returning a ballot, each Holder of a Claim entitled to vote will certify to the Bankruptcy Court and the Debtors that no other ballots with respect to such Claim has been cast or, if any other ballots have been cast with respect to such Claim, such earlier ballots are superseded and revoked.

All ballots will be accompanied by return envelopes.  It is important to follow the specific instructions provided on each ballot, as failing to do so may result in the ballot not being counted.

## D.      **Plan Objection Deadline**

The Bankruptcy Court has established _____, 2020, at 4:00 p.m., prevailing Eastern Time, as the deadline to object to confirmation of the Plan (the "Plan Objection Deadline"). All such objections must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the Disclosure Statement Order and Solicitation Procedures so that they are actually received on or before the Plan Objection Deadline.  The Debtors believe that the Plan Objection Deadline, as established by the Bankruptcy Court, affords the Bankruptcy Court, the Debtors, and other parties in interest reasonable time to consider the objections to the Plan before a Confirmation Hearing.

## E.      **Confirmation Hearing**

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan for _____, 2020, at ___:_____ ___.m. (ET) in the Bankruptcy Court, located at 824 N. Market Street, _____ Floor, Courtroom ___, Wilmington, DE 19801 (the "Confirmation Hearing").  The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the entities who have filed objections to the Plan, without further notice to other parties in interest.  The Bankruptcy Court, in its discretion and before a Confirmation Hearing, may put in place additional procedures governing such hearing.  The Plan may be modified, if necessary, before, during, or as a result of the hearing to confirm the Plan without further notice to parties in interest, subject to the terms of the Plan.

## F.      **Overview of the Plan**

THE FOLLOWING IS A BRIEF SUMMARY OF THE TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN.  CREDITORS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW THE MORE DETAILED DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT AND THE PLAN ITSELF.

The Plan is a plan of liquidation which, among other things, provides for a Liquidating Trustee to liquidate or otherwise dispose of the remaining assets of the Estates, to the extent such assets were not previously monetized to Cash or otherwise transferred by the Debtors prior to the Effective Date (including, without limitation, the prepetition transfer of certain assets of the

Debtors to the ABL Agent pursuant to the Strict Foreclosure Agreement), and to distribute all net proceeds to creditors (including payment in full of all Allowed Other Secured Claims (subject to the Debtors' election of alternative treatments under the Plan and solely to extent of the value of the collateral which secured such Claim), Administrative Claims, Priority Tax Claims, and Priority Non-Tax Claims) generally in accordance with the priority scheme under the Bankruptcy Code, subject to the terms of the Plan, the Strict Foreclosure Agreement, and the Cash Collateral Orders; *provided, however,* under the Plan, the Debtor Release and the Third Party Release that are in favor of the ABL Agent, the ABL Lenders, and their respective Related Persons, are solely contingent on the ABL Agent releasing from escrow (such escrow to be funded by the ABL Agent within one (1) business day of the Confirmation Date) to the Liquidating Trustee the $2,000,000 GUC Fund, which fund will be used solely to make Pro Rata distributions to Holders of Allowed Unsecured Claims in accordance with the Plan, the Strict Foreclosure Agreement, and the Liquidation Trust Agreement. The GUC Fund provided by Lineage will be the primary source of recovery for general unsecured creditors (Class 6 under the Plan), and such distributions would otherwise not be available under the Debtors' circumstances, or in a Chapter 7 proceeding.

Notwithstanding any of the foregoing, the Holder of the ABL Secured Claims shall retain its Lien on the ABL Collateral until such collateral is disposed of or released in accordance with the Strict Foreclosure Agreement, the Cash Collateral Orders, and the Plan. For the avoidance of doubt, all Available Cash, which expressly excludes the GUC Fund, shall be used by the Debtors to pay Allowed Administrative Claims and make distributions to the Debtors' Creditors other than the Holder of the ABL Secured Claims, in accordance with the Strict Foreclosure Agreement, the Cash Collateral Orders, and the Plan.

Further, notwithstanding any of the foregoing, the Holder of the Darden Note Secured Claims shall receive no distribution under the Plan on account of said Secured Claims. Any Allowed unsecured deficiency claim of Darden relating to the Darden Note shall be classified and treated as an Unsecured Claim in Class 8. The Holder of the Darden Note Secured Claims is deemed to vote for the Plan pursuant to the applicable Intercreditor Agreement(s) and related documents.

Notwithstanding any of the foregoing, the Holder of the Term Loan Guarantee Claims shall receive no distribution under the Plan on account of its Claims; *provided that* nothing herein or in the Plan is intended by the Debtors to, nor shall, affect, modify or release non-Debtor Huron Real Estate Associates' obligations owed to the Holder of the Term Loan Guarantee Claims arising under the Term Loan Agreement. The Holder of the Term Loan Guarantee Claims is deemed to vote for the Plan pursuant to the applicable Intercreditor Agreement(s) and related documents.

Each Holder of an Allowed Unsecured Claim in Class 6 will receive a Pro Rata share of the Liquidating Trust Interests in exchange for their Allowed Claims following the payment or reserve for Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims. Pursuant to the Plan, the $2 million GUC Fund will be released to the Liquidating Trustee for administration in accordance with the Plan, the Liquidating Trust Agreement, and the Confirmation Order. Notwithstanding the foregoing or any other provision

of the Plan, no distributions from the GUC Fund shall be made to (i) Lineage on account of any of its Allowed Claims against the Debtors or (ii) on account of any unsecured deficiency Claims of the Term Loan Agent, the Term Loan Lenders and/or Darden if and to the extent prohibited under the applicable Intercreditor Agreements.

Lastly, the Holders of Intercompany Claims and the Holders of Equity Interests will not receive any distributions or be allowed to retain any property under the Plan.

Set forth below is a table summarizing the classification of and estimated recoveries on account of Allowed Claims and Equity Interests under the Plan. The actual distributions may differ from those set forth in the table depending on the amount of Claims ultimately allowed in each category or Class and the extent of Liquidating Trust Assets ultimately available for distribution.

| DESCRIPTION/CLASS | ESTIMATED ALLOWED AMOUNT | ESTIMATED DISTRIBUTION (%) |
|---|---|---|
| Administrative Claims | $_____ | 100% |
| Priority Tax Claims | $_____ | 100% |
| Class 1 Priority Non-Tax Claims | $_____ | 100% |
| Class 2 ABL Secured Claims | [TBD] | [TBD] |
| Class 3 Darden Note Secured Claims | [TBD] | 0% |
| Class 4 Term Loan Guarantee Claims | [TBD] | 0% |
| Class 5 Other Secured Claims | $_____ | 100% |
| Class 6 Unsecured Claims | $_____ -$_____ | ___% - ___% |
| Class 7 Intercompany Claims | N/A | 0% |
| Class 8 Equity Interests | N/A | 0% |

## II.

## BACKGROUND AND CHAPTER 11 CASES

As more fully explained below, the Debtors (also referred to herein at times as the "Company") recently completed a prepetition foreclosure process pursuant to which substantially all of their assets were foreclosed upon by Lineage Bluebird Debtco, LLC pursuant to the Foreclosure Agreement and subsequently transferred to certain Lineage affiliates, including Lineage Foodservice Solution, LLC ("Solutions"), consistent with the terms of the Foreclosure Agreement. The Foreclosure Agreement, among other things, provided for the set-aside of $2 million for distribution to holders of general unsecured claims upon consummation of a plan of liquidation as well as the consent of Lineage to the Debtors' use of cash collateral during the Chapter 11 Cases in accordance with the terms of the Foreclosure Agreement and Cash Collateral Order. The Foreclosure Agreement also contains several milestones that require, among other things, confirmation of the Plan within 90 days of the Petition Date.

## A.  **Debtors' History and Formation**

The Company was founded in 1919 as Maines Candy Company by Floyd L. Maines, Sr. ("Floyd Sr."), and originally distributed nickel candy to local grocers.  In the 1940s, under the direction of Floyd Maines, Jr. ("Floyd Jr."), the Company broadened its product base with fountain supplies, toys and paper products.  Floyd Jr's, sons, David and William (the "Maines Brothers"), expanded the Company into foodservice in the 1970s.  Under the ownership and guidance of the Maines Brothers, the Company grew into one of the top ten largest food distributors in the United States and serviced approximately 6,100 restaurants with food and related non-food products, including produce, frozen foods, proteins, canned goods, dry grocery products, beverage items, cleaning materials and disposable items ("Foodservice Products").  Prior to the Petition Date and foreclosure of the Debtors' assets by Lineage, the Debtors were a leading private independent full-line foodservice distributor whose annual revenues exceeded $2.0 billion (which amount would be greater if the value of Darden Foodservice Products were taken into consideration).

Through the end of 2019, the Debtors conducted business in over 30 states, and operated out of 10 distribution centers and 3 retail stores across the Northeastern, Midwestern, and Southern regions of the United States.

The Debtors' primary business consisted of two business units.  The foodservice supply chain solutions unit provided centralized purchasing and distribution for multi-unit "quick service restaurant" national chains (the "QSR Business"), including Burger King, Tim Hortons, Wendy's, Applebee, IHOP and Chilis.  As part of this business, the Debtors managed every element of the supply chain for their customers, from the purchasing of Foodservice Products to their final delivery at each restaurant.  Each of the QSR Business customers provided a list of Foodservice Products that the Debtors were required to supply to these franchisees.  The Debtors' procurement team would then source those Foodservice Products from a variety of approved vendors.  These Foodservice Products were delivered to the Company's multi-temp distribution centers, where they were stored at the appropriate temperature, before being loaded and shipped to individual franchisees.

The Debtors' foodservice logistics services business unit (the "Darden Business") serviced restaurants owned by Darden Restaurants, Inc. ("Darden").  The Darden Business provided logistics, including receiving, storage, and transportation services, for restaurants owned by Darden.  These restaurants include Olive Garden, Long Horn Steakhouse, Cheddar's Scratch Kitchen, and the Capital Grille, among others.  The Darden Business was similar to the QSR Business, except that Darden purchased the Foodservice Products, which were then managed by the Company's procurement team.  The Debtors sold the Foodservice Products on a consignment basis with Darden maintaining ownership of the products throughout this process.  The Debtors earned a fee for each case of product delivered.

Prior to the foreclosure of the Debtors' assets, the Debtors employed approximately 870 people nationwide, the majority of whom were employed on a full-time basis.

B.      **Debtors' Corporate and Capital Structures**

1.      **Corporate Structure**

An organizational chart showing the Debtors is attached hereto as **Exhibit B**. As set forth on the organizational chart, Maines is the Company's ultimate parent through its 100% ownership in each of the other Debtor entities. All of the Company's subsidiaries are wholly owned by Maines directly or through wholly-owned subsidiaries.

2.      **Prepetition Capital Structure**

a.      **Prepetition Indebtedness**

As of the Petition Date, the Debtors' prepetition capital structure consisted of the following: (a) a revolving credit agreement between the Debtors and Lineage in an outstanding principal amount of approximately $10.329 million, (b) a guaranty by the Debtors (except for Maines Paper & Food Service - Maryland, Inc. ("MPFS - Maryland")) of a $35.0 million term loan secured by substantially all assets of non-Debtor Huron Real Estate Associates, LLC ("Huron Real Estate"); (c) a $10.0 million secured promissory note owed by the Debtors to Darden Direct Distribution, Inc.; and (d) a $1.7 million unsecured term note owed by MPFS - Maryland to M&T Bank.

b.      **Revolving Credit Agreement**

Before the Petition Date, the Debtors, as borrowers, entered into that certain *Amended and Restated Revolving Credit Agreement*, dated as of August 10, 2017 (as amended, the "Revolving Credit Agreement") with Lineage (in such capacity, the "Revolving Agent") as successor in interest to PNC Bank, National Association, as agent for the lenders thereunder and the financial institutions or other entities from time to time party thereto as lenders (collectively, the "Revolving Lenders," and together with the Revolving Agent, the "Revolving Secured Parties"). The Revolving Credit Agreement provides for access to Revolving Advances, FILO Advances, Letters of Credit, and Swing Loans (each as defined in the Revolving Credit Agreement).

The Revolving Credit Agreement provides a first-priority, fully-perfected security interest in and liens on all of the Debtors' right, title, and interest in, to and under the "Collateral" as defined in the Revolving Credit Agreement (the "Revolving Collateral"), including Cash Collateral.

As of the Petition Date, the total principal outstanding under the Revolving Credit Agreement is $10.329 million plus accrued and unpaid interest with respect thereto and any additional fees, costs, expenses owing under or in connection therewith (the "Revolving Obligations"). Prior to Lineage's acquisition of the indebtedness under the Revolving Credit Agreement on April 23, 2020, the prior principal amount outstanding under such credit agreement was approximately $41.9 million. With the additional funding to the Debtors provided by Lineage under the Foreclosure Agreement, the outstanding amount under the Revolving Credit Agreement was in excess of $90 million.

Pursuant to the terms of that certain *Strict Foreclosure, Deed in Lieu and Settlement Agreement*, dated as of May 17, 2020 (as amended, the "Foreclosure Agreement"), between the Debtors, the Revolving Agent, Darden Direct Distribution, Inc., and certain related parties, the Revolving Agent, among other things, accepted certain of the Revolving Collateral in partial satisfaction of the Revolving Obligations, allowed the Debtors to retain certain assets including cash, and consented to the Debtors' use of such Cash Collateral on the terms set forth therein.

### b.    Term Credit Agreement

Before the Petition Date, non-Debtor affiliate, Huron Real Estate, as borrower, entered into that certain Term Loan and Security Agreement, dated as of January 15, 2019 (the "Term Credit Agreement") with PNC Bank, National Association, as agent (in such capacity, the "Term Agent") for the lenders thereunder and the financial institutions or other entities from time to time party thereto as lenders (collectively, the "Term Lenders," and together with the Term Agent, the "Term Secured Parties"). The Debtors, aside from MPFS - Maryland, are guarantors of the obligations under the Term Credit Agreement.

The Term Lenders assert that the Term Credit Agreement provides a first-priority security interest in and lien on the "Collateral" as defined in the Term Credit Agreement (the "Term Collateral") and a second-priority security interest in and lien on all of Debtors' right, title, and interest in the Revolving Collateral. The Term Collateral belongs to non-Debtor Huron Real Estate.

The Term Lenders assert that, as of the Petition Date, the total principal outstanding under the Term Credit Agreement is $35.0 million plus accrued and unpaid interest with respect thereto and any additional fees, costs, expenses owing under or in connection therewith (the "Term Obligations").

Pursuant to the terms of that certain Amended and Restated Intercreditor Agreement, dated as of April 23, 2020, between the Revolving Agent, as senior agent, and the Term Agent, as subordinated agent, the Term Agent agreed, among other things: (1) that its liens against the Revolving Collateral are junior to the liens of the Revolving Agent and (2) not to raise any objections to the Debtors' use of Cash Collateral approved by the Revolving Agent so long as any Revolving Obligations remain outstanding.

### c.    Darden Note

Before the Petition Date, the Debtors, other than Debtor MPFS -- Maryland, entered into that certain Secured Promissory Note, dated as of July 15, 2019, in favor of Darden Direct Distribution, Inc. ("Darden Direct" and together with the Revolving Secured Parties and the Term Secured Parties, the "Prepetition Secured Parties") in the original aggregate principal amount of $10 million (the "Darden Note" and together with the Revolving Credit Agreement and the Term Credit Agreement, the "Prepetition Loan Documents").

Darden Direct asserts that the Darden Note provides a third-priority security interest in and lien on all of Debtors' right, title, and interest in the Revolving Collateral and a second-priority security interest in and lien on all of Debtors' right, title, and interest in the Term Collateral, except for the property located at 1701 North Street, Endicott, NY 13760 (the

"Darden Collateral" and together with the Revolving Collateral and the Term Collateral, the "Prepetition Collateral").

Darden Direct asserts that, as of the Petition Date, the total principal outstanding under the Darden Note is $10 million, plus accrued and unpaid interest with respect thereto, and any additional fees, costs, expenses owing under or in connection therewith (the "Darden Obligations" and together with the Revolving Obligations and the Term Obligations, the "Prepetition Secured Obligations").

Pursuant to the terms of that certain Subordination Agreement, dated as of July 15, 2019, between PNC Bank National Association, as Term Agent and predecessor Revolving Agent, in such capacities as senior agent, and Darden Direct, as subordinated lender, Darden Direct agreed. Among other things: (1) that its liens against the Prepetition Collateral are junior to the liens of the Revolving Agent and the Term Agent and (2) not to raise any objections to the Debtors' use of Cash Collateral approved by the Revolving Agent and the Term Agent so long as any Revolving Obligations or Term Obligations remain outstanding.

### d.    M&T Note

MPFS - Maryland is the borrower under that certain Credit Agreement, dated as of April 29, 2016 with M&T Bank (the "M&T Credit Agreement"). Maines is the guarantor of MPFS - Maryland's obligations under the M&T Credit Agreement. The total principal outstanding under the M&T Credit Agreement is approximately $1.7 million as of the Petition Date.

### e.    Trade Debt

In addition to the funded debt, the Debtors previously incurred trade debt in the ordinary course of business. The Debtors believe they owe in excess of $100 million in trade debt as of the Petition Date.

### f.    Equity

As set forth on **Exhibit B**, Maines owns 100% of all equity interests in the remaining Debtor entities. All of Maines' membership interest are held by the Maines Brothers.

### 3.    Changes in the Board of Directors / Management

John C. DiDonato was appointed as the CRO of Maines in December 2019. In January 2020, James D. Decker was appointed as independent director of Maines. On May 16, 2020, and as part of the authorization and approval of the Strict Foreclosure Agreement, Mr. Decker was appointed as independent director of each of the remaining non-Maines Debtors, Chris Mellon was appointed as a director of certain Debtors, and the Maines Brothers were removed from the board of directors of the Debtors other than Maines. On June 5, 2020 the Maines Brothers resigned from the board of directors of Debtor Maines. On June 9, 2020, Chris Mellon resigned from the board of all applicable Debtors.

C.    **Prepetition Sale Process and Events Culminating in the Foreclosure and Bankruptcy Cases**

Even prior to the COVID-19 pandemic, the Debtors faced several years of significant operating pressures resulting from industry-wide truck driver and warehouse labor shortages. During 2018, the foodservice distribution industry specifically, and the distribution & logistics industries more generally, experienced a significant labor shortage, primarily due to the robust labor market. For the Company, these labor shortages caused delivery-related challenges and amplified expenses due to a greater reliance on independent contractors and increases in overtime and shrink cost. The Debtors took steps to identify and implement a number of cost-rationalization initiatives together with scheduled customer resignations in order to manage their costs and address these challenges. However, the cumulative effect of these operational challenges was severe: The Debtors experienced a $29.9 million pre-tax loss in 2018 and a $25.9 million pre-tax loss in 2019.

During the summer of 2018, the Maines Brothers decided they wanted to divest of the Company. In July 2018, the Company engaged Ernst & Young Capital Advisors LLC ("EY M&A") to market the Company's assets to prospective purchasers. Due to the nature and size of the Debtors' business, the primary targets were large strategic purchasers, i.e., other large foodservice distributors, and a selection of financial purchasers, including private equity firms. As part of the sale process, EY M&A contacted more than 50 parties, including strategic and financial buyers. Although there was substantial interest from certain strategic buyers, no written offers were ultimately received during this process.

During the 2018 initial marketing process, the Company identified that liquidity would become a concern during summer 2019. Accordingly, the Company retained the Restructuring and Advisory practice of Ernst & Young, LLP ("EY") to assist in liquidity management and instructed the Debt Capital Markets practice of EY to undertake efforts to raise additional capital. As a result of these efforts, the Company was able to secure the Huron Real Estate Term Loan and the Darden Note, in addition to $3.0 million in liquidity from two of its then-largest QSR Business customers. Additionally, the Company was able to secure price increases from several of its then-largest QSR Business customers, as well as from Darden. The price increases and liquidity management improved the financial performance of the Company, and EY M&A re-engaged the marketing process during the summer of 2019. Based on the more favorable outlook, EY M&A obtained bids both for the entire Company and for the various segments. At various times and in various configurations, the Company had secured bids for the Debtors' various business units as well as for the Company's corporate headquarters in Conklin, New York ("Corporate Park").

By February 2020, the Company had signed letters of intent with one buyer to purchase the QSR Business (except for Corporate Park) and a separate buyer to purchase the Corporate Park and the Darden Business.

By March 2020, the turnaround effort had been completed and the Company was at the precipice of closing a sale transaction for substantially all of its assets with the buyers of its business units. Unfortunately, less than a month and a half prior to the anticipated closing date of the sales, COVID-19 upended the foodservice distribution business. Following the imposition

of various shelter in-place orders, the Company's customer volumes declined by up to 87% in certain business segments and inventory levels declined. As result of the COVID 19 pandemic, The Company's customers, principally restaurant franchisees, were required to close their restaurant, provide take-out only services, or convert to all drive through service.

In the wake of the COVID-19 events, the buyer for the majority of the Debtors' operations and/or assets withdrew from the process and the lender for the Company's then-existing Revolving Lenders' asset-based loan facility (the "ABL Facility") exercised dominion over the Company's cash, severely limited its access to liquidity that could have been used for working capital purposes, and withdrew its support of a going concern transaction. In light of the ongoing uncertainty over the business, several large customers also terminated their distribution agreements with the Company.

On April 23, 2020, Lineage acquired the ABL and FILO credit facilities indebtedness in the face amount of $41.9 million, and, on May 16, 2020, commenced a partial strict foreclosure of the Company's assets pursuant to the Foreclosure Agreement. Under the Foreclosure Agreement, Lineage acquired substantially all of the Company's assets, which included all of the Debtors' inventory and receivables, Corporate Park, and Worcester, MA real estate.[3] As part of the foreclosure process, Lineage made offers of employment to 851 employees, representing substantially all of the Debtors' employees as of the foreclosure. The Foreclosure Agreement also provided for the forgiveness of $80 million in senior secured debt that Lineage had acquired under the Debtors' prior ABL and FILO Facility, plus a contribution of $7.5 million in cash to fund the Debtors' post-foreclosure wind down activities during their chapter 11 cases. Lineage also agreed pursuant to the Foreclosure Agreement to contribute $2 million in recoveries to holders of allowed general unsecured claims pursuant to the Debtors' proposed plan of liquidation (subject to the requirements of the Strict Foreclosure Agreement), fund the payment of up to $825,000 in PACA claims against the Debtors, and fund certain other items as contemplated by the Strict Foreclosure Agreement. Lineage also agreed to fund the Debtors' outstanding sale and use tax obligations and payroll tax obligations as of the effective date of the Foreclosure Agreement.

In connection with the Foreclosure Agreement, Debtor Maines and Lineage executed that certain *Transition Services Agreement*, dated as of May 17, 2020 (the "TSA"). Prepetition, the Debtors provided Lineage with certain transitional services under the TSA in order to effectuate the smooth transition of the business to Lineage, including the services of certain employees (the "Business Employees") on a full-time basis at Lineage's facilities through May 30, 2020 (the "Employee Services Term"). Lineage is responsible for reimbursing the Debtors for all costs related to the continued employment of the Business Employees, including compensation of employee benefits, workers' compensation, unemployment insurance coverage, and applicable payroll taxes related to the employment of the Business Employees during the Employee Services Term.

---

[3] The assets of non-Debtor Huron Real Estate were not included in the Strict Foreclosure Agreement.

**D.**     **Events During the Chapter 11 Cases**

1.     **First Day and Cash Collateral Relief**

In order to facilitate the Chapter 11 Cases, minimize disruption to the Debtors' affairs, and preserve the value of the Estates, the Debtors filed motions with the Bankruptcy Court on or shortly after the Petition Date seeking certain relief, including, without limitation, (i) joint administration of the Debtors' related Chapter 11 Cases; (ii) the appointment of Stretto as the claims and noticing agent in the Chapter 11 Cases; (iii) authority to file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor and redact certain personally identifiable information for the Debtors' individual creditors and interest holders, and for related relief; (iv) authority to maintain the Debtors' bank accounts, use existing business forms and checks, and continue to use the Debtors' current cash management system; (v) authority to pay in the Debtors' discretion certain prepetition sales, use and related taxes in the ordinary course of business; and (vi) authority to pay, up to a $750,000 cap, all claims arising, or of the type, under the Perishable Agricultural Commodities Act of 1930, to those vendors who supplied the Debtors with fresh fruits and vegetables prior to the foreclosure pursuant to the Strict Foreclosure Agreement.

The relief sought is typical in a chapter 11 case of this size and complexity and for a debtor in the Debtors' industry. [On June ___, 2020, the Court entered orders granting the requested relief noted above. [SUBJECT TO COURT APPROVAL]]  Copies of all relevant pleadings are on file with the Bankruptcy Court and can be obtained free of charge by accessing the noticing/claims agent's website at  https://cases.stretto.com/Maines.

The Debtors also filed a motion seeking entry of interim and final orders authorizing the Debtors' use of cash collateral (the "Cash Collateral"), granting limited adequate protection to the Revolving Agent, waiving the Debtors' right to surcharge the Revolving Collateral pursuant to section 506(c) of the Bankruptcy Code, and vacating or modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement the terms and provisions of orders.  Pursuant to the Strict Foreclosure Agreement, the Revolving Agent agreed that the Debtors would retain and use certain Cash Collateral in order to fund the Chapter 11 Cases and satisfy certain creditor claims, subject to Court approval.  As of the Petition Date, the Debtors had an urgent and immediate need for the use of the Cash Collateral in order to maintain their assets, satisfy their administrative obligations, and maximize the value of the Estates through a confirmed Plan.  [The Court entered an order granting the requested relief on an interim basis on June ___, 2020.  A hearing on final approval is currently scheduled for _____, 2020.] [SUBJECT TO COURT APPROVAL]

2.     **[Debtors' Retention of Professionals and Personnel**

The Debtors also filed applications to employ certain professionals, including Pachulski Stang Ziehl & Jones LLP as their bankruptcy counsel in the Chapter 11 Cases, and to retain Huron Consulting Group to provide a CRO and certain additional Huron personnel to assist the CRO.] [SUBJECT TO COURT APPROVAL]

**III.**

**SUMMARY OF THE PLAN**

**A.**     **General**

The Plan is a plan of liquidation that contemplates the sale or other disposition of the Debtors' remaining assets (including the prosecution of certain Causes of Action) and the distribution of the net proceeds thereof and the remaining net proceeds realized from the earlier sale or other disposition of substantially all of the Debtors' assets, to the Debtors' creditors. As a result of the Debtors' asset disposition efforts, the Debtors presently have approximately $_____ in cash available (including a $2 million GUC Fund to be funded by Lineage on the Effective Date and solely for the benefit of general unsecured creditors) for payment of expenses related to liquidation and distribution under the Plan.

**B.**     **Classification and Treatment of Claims and Equity Interests**

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation, and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

     1.     **Unclassified Claims**

Certain types of Claims are not placed into voting Classes; instead they are unclassified. They are not considered Impaired and they do not vote on the Plan because they are automatically entitled to the specific treatment provided for them in the Bankruptcy Code. As such, the Debtors have not placed the following Claims in a Class:

Administrative Claims. Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, each Holder of an Allowed Administrative Claim, other than a Professional Fee Claim, will receive from Available Cash, without interest, Cash equal to the Allowed amount of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the Holder of such Claim and the Debtors or the Liquidating Trustee, as the case may be; (c) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtors' business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtors' business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), as and when due under applicable law. All fees due and payable under 28 U.S.C. § 1930 that have not been paid shall be paid on or before the Effective Date.

Professional Fee Claims. Professionals requesting compensation or reimbursement of expenses pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code or required to file fee applications by order of the Bankruptcy Court for services rendered prior to

the Effective Date must file and serve pursuant to the notice provisions of the Interim Fee Order, an application for final allowance of compensation and reimbursement of expenses no later than sixty (60) days after the Effective Date. All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court. For avoidance of doubt, the Liquidating Trustee is not authorized under the Plan to object to applications for final allowance of compensation and reimbursement of expenses.

Upon approval of the fee applications by the Bankruptcy Court, the Liquidating Trustee shall pay Professionals all of their respective accrued and Allowed fees and reimbursement of expenses arising prior to the Effective Date, plus reasonable fees for services rendered, and actual and necessary costs incurred, in connection with the filing, service and prosecution of any applications for allowance of Professional Fees pending on the Effective Date or filed and/or served after the Effective Date, plus post-Effective Date fees approved by the Liquidating Trustee.

Priority Tax Claims. Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Tax Claim, the Liquidating Trust shall pay each holder of an Allowed Priority Tax Claim, from Available Cash, the full unpaid amount of such Allowed Priority Tax Claim on the earliest of the following dates: (i) on or as soon as practicable after the Effective Date, (ii) on or as soon as practicable after the date such Allowed Priority Tax Claim becomes an Allowed Claim, and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law.

2.    **Classification and Treatment of Claims and Equity Interests.**

The Plan classifies and treats other Claims and Equity Interests as follows:

Class 1 Claims - Priority Non-Tax Claims. Class 1 consists of Priority Non-Tax Claims. Class 1 is not an Impaired Class, and Holders of Priority Non-Tax Claims are not entitled to vote on the Plan.

The Liquidating Trustee shall pay, from Available Cash, the Allowed amount of each Priority Non-Tax Claim to each Entity holding a Priority Non-Tax Claim as soon as practicable following the later of: (a) the Effective Date and (b) the date such Priority Non-Tax Claim becomes an Allowed Claim (or as otherwise permitted by law). The Liquidating Trustee shall pay each Entity holding a Priority Non-Tax Claim in Cash in full in respect of such Allowed Claim without interest from the Petition Date; *provided, however*, that such Entity may be treated on such less favorable terms as may be agreed to in writing by such Entity.

Class 2 Claims – ABL Secured Claims. Class 2 consists of the ABL Secured Claims. Class 2 is an Impaired Class, and the Holder of the ABL Secured Claims is entitled to vote on the Plan.

The Holder of the ABL Secured Claims shall retain its Lien on the ABL Collateral until such collateral is disposed of or released in accordance with the Strict Foreclosure Agreement, the Cash Collateral Orders, and the Plan.  For the avoidance of doubt, all Available Cash, which expressly excludes the GUC Fund, shall be used by the Debtors to pay Allowed Administrative Claims and make distributions to the Debtors' Creditors other than the Holder of the ABL Secured Claims, in accordance with the Strict Foreclosure Agreement, the Cash Collateral Orders, and the Plan.

Class 3 Claims – Darden Note Secured Claims.  Class 3 consists of the Darden Note Secured Claims. Class 3 is an Impaired Class.  However, the Holder of the Class 3 Claim is deemed to vote for the Plan pursuant to the applicable Intercreditor Agreement(s) and related documents.

The Holder of the Darden Note Secured Claims will receive no distribution under the Plan on account of its Class 3 Claim.  Any Allowed unsecured deficiency claim of Darden relating to the Darden Note will be classified and treated as an Unsecured Claim in Class 8.

Class 4 Claims – Term Loan Guarantee Claims.  Class 4 consists of the Term Loan Guarantee Claims, which are any Claims against any of the Debtors other than MPFS – Maryland on the basis of any guarantees and/or similar agreements by the Debtors to satisfy the obligations of Huron Real Estate Associates arising from or based upon the Term Loan Agreement.  Class 4 is an Impaired Class.  However, the Holder of the Class 4 Claims is deemed to vote for the Plan pursuant to the applicable Intercreditor Agreement(s) and related documents.

The Holder of the Term Loan Guarantee Claims will receive no distribution under the Plan on account of its Class 4 Claims; *provided that* nothing herein or in the Plan is intended by the Debtors to, nor shall, affect, modify or release non-Debtor Huron Real Estate Associates' obligations owed to the Holder of the Term Loan Guarantee Claims arising under the Term Loan Agreement.

Class 5 Claims – Other Secured Claims.  Class 5 consists of Other Secured Claims.  For purposes of distributions under the Plan, each Holder of an Other Secured Claim in Class 5 is considered to be in its own separate subclass within Class 5 (*i.e.*, Class 5A, Class 5B, *etc.*), and each such subclass is deemed to be a separate Class for purposes of the Plan.

Except to the extent previously paid in full, to the extent any Other Secured Claims exist, at the option of the Debtors or the Liquidating Trustee, as applicable, one of the following treatments shall be provided: (i) the Holder of such Claim shall retain its Lien on its collateral until such collateral is sold, and the proceeds of such sale, less costs and expenses of disposing of such collateral, shall be paid to such Holder in full satisfaction and release of such Allowed Other Secured Claim; (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, or as otherwise agreed between the Holder of such Claim and the Debtors or the Liquidating Trustee, as applicable, the Holder of such Other Secured Claim will receive a Cash payment equal to the amount of its Allowed Other Secured Claim in full satisfaction and release of such Other Secured Claim; or (iii) the collateral securing the Creditor's Other Secured Claim

shall be abandoned to such Creditor, in full satisfaction, release, and discharge of such Other Secured Claim.

Class 6 Claims – Unsecured Claims.  Class 6 consists of Unsecured Claims, which are any Claims against the Debtors or Estates that are not ABL Secured Claims, Darden Note Secured Claims, Term Loan Guarantee Claims, Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, or Intercompany Claims.  Class 6 is an Impaired Class, and Holders of Class 6 Claims are entitled to vote to accept or reject the Plan; *provided, however,* the Term Loan Agent, the Term Loan Lenders and Darden, on account of their respective Class 6 Claims, are deemed to vote for the Plan pursuant to the applicable Intercreditor Agreement(s) and related documents.

Each Holder of an Allowed Unsecured Claim in Class 6 will receive a Pro Rata share of the Liquidating Trust Interests in exchange for their Allowed Claims following the payment or reserve for Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims.  Pursuant to Section V.H. of the Plan, the $2,000,000 GUC Fund will be released to the Liquidating Trustee for administration in accordance with the Plan, the Liquidating Trust Agreement, and the Confirmation Order.  Unsecured Claims are subject to all statutory, equitable, and contractual subordination claims, rights, and grounds available to the Debtors, the Estates, and pursuant to the Plan, the Liquidating Trustee, which subordination claims, rights, and grounds (including, without limitation, any such claims, rights, and grounds set forth in the Intercreditor Agreements) are fully enforceable prior to, on, and after the Effective Date.

Notwithstanding the foregoing or any other provision of the Plan, no distributions from the GUC Fund shall be made to (i) Lineage on account of any of its Allowed Claims against the Debtors or (ii) on account of any unsecured deficiency Claims of the Term Loan Agent, the Term Loan Lenders and/or Darden if and to the extent prohibited under the applicable Intercreditor Agreements.

Class 7 – Intercompany Claims.  Class 7 consists of Intercompany Claims.  Class 7 is an Impaired Class.  However, the Holders of the Class 7 Claims consent to the foregoing Plan treatment, vote for the Plan, and waive any objection to the Confirmation of the Plan.  The Holders of Intercompany Claims will receive no distribution under the Plan on account of their respective Class 7 Claims

Class 8 – Equity Interests.  Holders of Equity Interests will receive no distribution under the Plan and therefore are deemed to have rejected the Plan.  Accordingly, Holders of Equity Interests are not entitled to vote.  Upon the Effective Date, the Equity Interests will be deemed cancelled and will cease to exist.

## C.   **Means for Implementation of the Plan**

1.   **No Substantive Consolidation**

The Plan is being proposed as a joint plan of reorganization of the Debtors for

administrative purposes only and constitutes a separate chapter 11 plan for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Equity Interests set forth in the Plan; *provided that* the Debtors shall consolidate Allowed Claims into one Estate for purposes of voting on and distributions under the Plan.

2.      **Dissolution of Debtors**

From and after the Effective Date, the Debtors shall be dissolved, without any further action required on the part of the Debtors or the Debtor's officers, directors, interestholders, and/or any other parties; provided, however, the Liquidating Trustee in his or her discretion shall be authorized to take any and all actions necessary or desirable in relation to dissolution of the Debtors. On the Effective Date, the employment, retention, appointment and authority of all officers, directors, employees and professionals of the Debtors shall be deemed to terminate.

3.      **Appointment of the Liquidating Trustee**

The Debtors will appoint the Liquidating Trustee prior to the filing of the Plan Supplement and the identity of the Liquidating Trustee will be disclosed in the Plan Supplement. From and after the Effective Date, professionals may be retained by the Liquidating Trustee without further need for documentation or Bankruptcy Court approval. All fees and expenses incurred by the professionals retained by the Liquidating Trustee following the Effective Date shall be paid by the Liquidating Trust from the Liquidating Trust Assets (after payment in full of all Allowed Administrative Claims) in accordance with the Liquidating Trust Agreement.

4.      **The Liquidating Trust**

On the Effective Date, the Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement for the purpose of, *inter alia*, (a) administering the Liquidating Trust Assets, (b) prosecuting and/or resolving all Disputed Claims, (c) investigating and pursuing any Causes of Action the Debtors hold or may hold against any Entity, and (d) making all Distributions to the Beneficiaries provided for under the Plan. The Liquidating Trust is intended to qualify as a liquidating trust pursuant to Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of the trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Accordingly, the Liquidating Trustee shall, in an orderly manner, liquidate and convert to Cash the Liquidating Trust Assets, and make timely Distributions to the Beneficiaries, and not unduly prolong the duration of the Liquidating Trust. Neither the Liquidating Trust nor the Liquidating Trustee shall be or shall be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement.

On the Effective Date, the Liquidating Trust Assets shall vest automatically in the Liquidating Trust. The Plan shall be considered a motion pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for such relief. The transfer of the Liquidating Trust Assets to the Liquidating Trust shall be made for the benefit and on behalf of the Beneficiaries. The assets comprising the Liquidating Trust Assets will be treated for tax purposes as being transferred by

the Debtors to the Beneficiaries pursuant to the Plan in exchange for their Allowed Claims and then by the Beneficiaries to the Liquidating Trust in exchange for the beneficial interests in the Liquidating Trust. The Beneficiaries shall be treated as the grantors and owners of the Liquidating Trust. Upon the transfer of the Liquidating Trust Assets, the Liquidating Trust shall succeed to all of the Debtors' rights, title and interest in the Liquidating Trust Assets, and the Debtors will have no further interest in or with respect to the Liquidating Trust Assets.

Except to the extent definitive guidance from the IRS or a court of competent jurisdiction (including the issuance of applicable Treasury Regulations or the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one) indicates that such valuation is not necessary to maintain the treatment of the Liquidating Trust as a liquidating trust for purposes of the Internal Revenue Code and applicable Treasury Regulations, as soon as possible after the Effective Date, the Liquidating Trustee shall make a good-faith valuation of the Liquidating Trust Assets. The valuation shall be used consistently by all parties (including, without limitation, the Debtor, the Liquidating Trust, the Beneficiaries) for all federal income tax purposes.

5.      **Rights and Powers of the Liquidating Trustee**

The Liquidating Trustee shall be deemed the Estates' representative in accordance with Section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under Sections 704 and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules to act on behalf of the Liquidating Trust. Without limiting the foregoing, the Liquidating Trustee will have the right to, among other things, (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Liquidating Trust Agreement; (2) liquidate the Liquidating Trust Assets; (3) investigate, prosecute, settle, abandon or compromise any Causes of Action the Debtors hold or may hold against any Entity; (4) make all Distributions in accordance with the Plan and the Liquidating Trust Agreement; (5) administer and use the GUC Fund to make Distributions solely to Holders of Allowed Unsecured Claims on account of said Allowed Claims; (6) establish and administer any necessary reserves for Disputed Claims that may be required; (7) object to the Disputed Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such objections; (8) assert or waive any attorney-client privilege on behalf of the Debtors and Estates with regard to acts or events during time periods prior to the Petition Date; and (9) employ and compensate professionals and other agents, including, without limitation, existing Professionals employed by the Debtors or the Committee in accordance with the Liquidating Trust Agreement or the Plan, *provided*, *however*, that any such compensation shall be made only out of the Liquidating Trust Assets, to the extent not inconsistent with the status of the Liquidating Trust as a liquidating trust within the meaning of Treas. Reg. § 301.7701-4(d) for federal income tax purposes.

6.      **Fees and Expenses of the Liquidating Trust**

Subject to payment in full of all Allowed Administrative Claims, and except as otherwise ordered by the Bankruptcy Court, expenses incurred by the Liquidating Trust on or after the

Effective Date shall be paid in accordance with the Liquidating Trust Agreement without further order of the Bankruptcy Court.

7.      **Transfer of Beneficial Interests in the Liquidating Trust**

Liquidating Trust Interests shall not be transferable except upon death of the interest holder or by operation of law. The Liquidating Trust shall not have any obligation to recognize any transfer of Claims or Equity Interests occurring after the Distribution Record Date.

8.      **Available Cash**

Available Cash, which expressly excludes the GUC Fund, shall be used to fund distributions to Creditors or other payments to be made pursuant to or otherwise consistent with the Plan and the Confirmation Order.  For the avoidance of doubt, the GUC Fund may only be used to fund distributions to be made to Holders of Class 6 Claims on account of Allowed Class 6 Claims.  Available Cash, and not any of the GUC Fund, will be used by the Liquidating Trustee to pay for the expenses of the Liquidating Trust in accordance with the Liquidating Trust Agreement.

On or as soon as practicable following the Effective Date, the Liquidating Trust Assets Account shall be opened by the Liquidating Trustee and funded with all Available Cash, which money shall constitute Liquidating Trust Assets.  Thereafter, from time to time, upon receipt of any Liquidation Proceeds or any Litigation Recovery, the Liquidating Trustee shall deposit such funds into the Liquidating Trust Assets Account, and they shall become part of the Liquidating Trust Assets for funding distributions to Creditors and paying the expenses of the Liquidating Trust

9.      **Litigation**

Except as otherwise provided in the Plan, all Litigation is retained, vested in the Liquidating Trust, and preserved pursuant to Section 1123(b) of the Bankruptcy Code.  From and after the Effective Date, all Litigation will be prosecuted or settled by the Liquidating Trustee. To the extent any Litigation is already pending on the Effective Date, the Liquidating Trustee, as successor to the Debtors or the Committee (in any derivative capacity or as an intervening party), will continue the prosecution of such Litigation and shall be substituted as plaintiff, defendant, or in any other capacity for the Debtors or the Committee pursuant to the Plan and the Confirmation Order on the Effective Date, without need for any further motion practice or notice in any case, action, or matter.

10.      **[Dissolution of the Committee**

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Cases, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto).  The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims

for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to Section 2(C) of the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtors' or Committee's Professionals to represent the Liquidating Trustee or to be compensated or reimbursed per the Plan and the Liquidating Trust Agreement in connection with such representation.]

11.    **Full and Final Satisfaction**

Commencing upon the Effective Date, subject to the terms of the Plan and the Liquidating Trust Agreement, the Liquidating Trustee shall be authorized and directed to distribute the amounts required under the Plan to the Holders of Allowed Claims according to the provisions of the Plan. Upon the Effective Date, all Debts of the Debtors shall be deemed fixed and adjusted pursuant to the Plan, and the Liquidating Trust shall have no liability on account of any Claims or Equity Interests except as set forth in the Plan and in the Liquidating Trust Agreement. All payments and all distributions made by the Liquidating Trustee under the Plan shall be in full and final satisfaction, settlement, and release of all Claims against the Liquidating Trust; *provided, however*, that nothing contained in this Section V of the Plan, or in any other provision of the Plan, shall be deemed to constitute or result in a discharge of the Debtor under Bankruptcy Code Section 1141(d).

12.    **Distribution Procedures**

The Liquidating Trustee shall make Distributions to Holders of Claims as provided in Article III of the Plan. Subject to the terms of the Liquidating Trust Agreement, the Liquidating Trustee may, in its sole discretion, make a full or partial Pro Rata Distribution to the Holders of Unsecured Claims on the Initial Distribution Date or a Subsequent Distribution Date.

Any Distribution not made on the Initial Distribution Date or a Subsequent Distribution Date because the Claim relating to such Distribution had not been Allowed on that Distribution Date shall be held by the Liquidating Trust for Distribution on any Subsequent Distribution Date after such Claim is Allowed. No interest shall accrue or be paid on the unpaid amount of any Distribution.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the Holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Distribution Record Date. The Liquidating Trustee shall have no obligation to recognize any transfer of any Claim occurring after the Distribution Record Date. In making any Distribution with respect to any Claim, the Liquidating Trustee shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of claim filed with respect thereto or on the Schedules as the Holder thereof as of the close of

business on the Distribution Record Date and upon such other evidence or record of transfer or assignment that is known to the Liquidating Trustee as of the Distribution Record Date.

Cash payments made pursuant to the Plan or Liquidating Trust Agreement shall be in United States dollars by checks drawn on a domestic bank selected by the Liquidating Trustee or by wire transfer from a domestic bank, at the option of the Liquidating Trustee.

Checks issued by the Liquidating Trustee on account of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof.  Requests for the reissuance of any check that becomes null and void shall be made directly to the Liquidating Trustee by the Holder of the Allowed Claim to which the check was originally issued.  Any Claim in respect of such voided check shall be made in writing on or before the later of six months from the Effective Date or 90 days after the date of issuance thereof.  After that date, all Claims in respect of voided checks shall be discharged and forever barred and the proceeds of those checks shall revest in and become the property of the Liquidating Trust as unclaimed property in accordance with Section 347(b) of the Bankruptcy Code.

13.     **Liquidating Trust Assets Account**

Unless otherwise provided in the Confirmation Order, the Liquidating Trust Assets Account shall be invested by the Liquidating Trustee in a manner consistent with the objectives of Section 345(a) of the Bankruptcy Code and in its reasonable and prudent exercise of discretion.  The Liquidating Trustee shall have no obligation or liability to Beneficiaries in connection with such investments in the event of any unforeseeable insolvency of any financial institution where such funds are held.

14.     **Resolution of Disputed Claims**

No Distribution Pending Allowance.  Notwithstanding any other provision of the Plan, the Liquidating Trustee shall not distribute any Cash or other property on account of any Disputed Claim unless and until such Claim becomes Allowed.  Nothing contained herein, however, shall be construed to prohibit or require payment or Distribution on account of any undisputed portion of a Claim.

Resolution of Disputed Claims.  Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Liquidating Trustee shall have the right to make, file, prosecute, settle, withdraw, or resolve objections to Claims.  The costs of pursuing the objections to Claims shall be borne by the Liquidating Trust.  From and after the Confirmation Date, all objections with respect to Disputed Claims shall be litigated to a Final Order except to the extent, the Liquidating Trustee elects to withdraw any such objection or the Liquidating Trustee and the Claimant elect to compromise, settle, or otherwise resolve any such objection, in which event they may settle, compromise, or otherwise resolve any Disputed Claim or Disputed Equity Interest without approval of the Bankruptcy Court.

Objection Deadline.  All objections to Claims shall be filed and served upon the Claimant not later than the Claims Objection Deadline, as such may be extended by order of the Bankruptcy Court.

Estimation of Claims.  At any time, (a) prior to the Effective Date, the Debtors, and (b) after the Effective Date, the Liquidating Trustee, may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by Section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Liquidating Trust have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during Litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the Claim, the Debtors or the Liquidating Trust, as applicable, may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim.  All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdraw, or resolved by any mechanism of the Bankruptcy Court.

Disallowance of Claims.  Except as otherwise agreed or ordered by the Bankruptcy Court, any and all proofs of claim filed after the Bar Date shall not be treated as an Allowed Claim for purposes of Distribution without any further notice or action, and Holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Confirmation Date the Bankruptcy Court has entered an order deeming such Claim to be timely filed; *provided, however*, that such Claims shall be deemed Allowed (unless Disputed) after the payment in full of all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Claims, Allowed Priority Non-Tax Claims, and all Allowed Unsecured Claims.

Any Claims held by Entities from which property is recoverable under Sections 542, 543, 550, or 553 of the Bankruptcy Code or Entities that are transferees of transfers avoidable under Section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, provided that such Cause of Action is retained by the Liquidating Trust, shall be deemed disallowed pursuant to Section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action the Debtors hold or may hold against any Entity have been resolved or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Estate by that Entity have been turned over or paid to the Debtors or Liquidating Trust.

Adjustment Without Objection.  Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register at the direction of the Debtors or the Liquidating Trustee, as applicable, without an objection filed and without further notice to or action, order, or approval of the Bankruptcy Court.

15.     **Reserve Provisions for Disputed Claims**

<u>Establishment of Disputed Reserves.</u>  On or an Distribution Date, the Liquidating Trustee shall reserve Cash required for distribution on Disputed Claims as if such Claims were Allowed as filed with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Liquidating Trustee (the "<u>Disputed Claim Reserve</u>").  On each Distribution date after the Effective Date in which the Liquidating Trustee makes Distributions to Holders of Allowed Claims, the Liquidating Trustee shall retain on account of Disputed Claims an amount the Liquidating Trustee estimates is necessary to fund the Pro Rata Share of such Distributions to Holders of Disputed Claims if such Claims were Allowed, with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Liquidating Trustee.

<u>Maintenance of Disputed Claim Reserves.</u>  The Liquidating Trust shall hold property in the Disputed Claim Reserve in trust for the benefit of the Holders of Disputed Claims that are ultimately determined to be Allowed.  Each Disputed Claim Reserve shall be closed and extinguished by the Liquidating Trust when all Distributions and other dispositions of Cash of other property required to be made hereunder will have been made in accordance with the terms of the Plan.  Upon closure of a Disputed Claim Reserve, all Cash or other property held in that Disputed Claim Reserve shall revest in and become unrestricted property of the Liquidating Trust.  All funds or other property that vest or revest in the Liquidating Trust pursuant to this paragraph shall be used to pay by the Liquidating Trust in accordance with the Plan and the Liquidating Trust Agreement.

<u>Limitations on Funding Disputed Claim Reserves.</u>  Except as expressly set forth in the Plan, neither the Debtors nor the Liquidating Trustee shall have any duty to fund any Disputed Claim Reserve except from the Liquidating Trust Assets.

**D.     Unexpired Leases and Executory Contracts**

Except with respect to: (i) executory contracts or unexpired leases that were previously assumed or rejected by order of the Bankruptcy Court, (ii) the Strict Foreclosure Agreement, any prepetition agreements entered into by the Debtors in connection with the Strict Foreclosure Agreement and the Prepetition Strict Foreclosure, and any agreements to be assigned to Lineage pursuant to the Strict Foreclosure Agreement (all such agreements described in this subsection (ii) shall be deemed assumed as of the Effective Date), and (iii) executory contracts or unexpired leases that are the subject of a pending motion to assume or reject, pursuant to Section 365 of the Bankruptcy Code, on the Effective Date, each executory contract and unexpired lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code; *provided, however*, that nothing herein or in Section VI.A of the Plan shall cause the rejection, breach, or termination of any contract of insurance benefiting the Debtors and the Estates, the Debtors' officers, directors and managers and/or the Liquidating Trust.  Nothing herein or in Article VI of the Plan shall be construed as an acknowledgement that a particular contract or agreement is executory or is properly characterized as a lease.  The Confirmation

Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to Section 365 of the Bankruptcy Code, as of the Effective Date. The non-Debtor parties to any rejected personal property leases shall be responsible for taking all steps necessary to retrieve the personal property that is the subject of such executory contracts and leases, and neither the Debtors nor the Liquidating Trust shall bear any liability for costs associated with such matters.

All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases pursuant to Confirmation of the Plan, if any, must be filed with the Claims Agent within thirty (30) days after the earlier of the Effective Date or an order of the Bankruptcy Court approving such rejection. Any Claim arising from the rejection of an executory contract or unexpired lease pursuant to Confirmation of the Plan that is not filed within such times will be subject to objection. All such Claims for which Proofs of Claim are timely and properly filed and ultimately Allowed will be treated as Unsecured Claims subject to the provisions of Article 3 of the Plan.

Notwithstanding anything to the contrary contained herein or in the Plan, Confirmation of the Plan shall not discharge, impair or otherwise modify any obligations of the Insurance Policies. To the extent one or more of the Insurance Policies provide potential coverage related to one or more Causes of Action the Debtors hold or may hold against any Entity, the Debtors shall, to the extent permissible under each Insurance Policy, assign all of their rights thereunder with respect to such Causes of Action to the Liquidating Trust. All net proceeds (including, for the avoidance of doubt, net of any deductibles or retentions) of Insurance Policies received by the Liquidating Trust shall be treated as proceeds of such Causes of Action for all purposes under the Plan. The Debtors shall take no action to or otherwise impair the Insurance Policies. Nothing in the Plan shall diminish or impair the enforceability of the Insurance Policies and related agreements that may cover Claims and Causes of Action against the Debtors or any other Entity.

E.    **Conditions to Confirmation of the Plan**

Confirmation of the Plan is conditioned upon the satisfaction of each of the following conditions precedent, any one or more of which may be waived by the Debtors: (i) the Bankruptcy Court shall have approved a disclosure statement to the Plan in form and substance acceptable to the Debtors and (ii) the Debtors shall have determined that there will be sufficient Cash on the Effective Date to pay (or with respect to Disputed Claims to reserve for as required pursuant to the Plan) (i) Allowed Administrative Claims, Non-Tax Priority Claims, and Priority Tax Claims in full (or in such lesser amount as may be agreed to by the Claimant) and (ii) the Confirmation Order to be presented to the Bankruptcy Court at the Confirmation Hearing shall be acceptable to the Debtors in form and substance. If any one or more of the conditions in Section VII.A of the Plan is not met, the Debtors may withdraw the Plan and, if withdrawn, the Plan shall be of no further force or effect.

F.    **Conditions to Effectiveness**

The occurrence of the Effective Date is conditioned upon the satisfaction of each of the following conditions precedent, any one or more of which may be waived by the Debtors: (i) a

Confirmation Order in form and substance acceptable to the Debtors shall have been entered by the Bankruptcy Court and become a Final Order which is not subject to any stay of effectiveness; (ii) the Liquidating Trust shall have been created pursuant to the terms of the Plan, the Liquidating Trustee shall have been appointed by order of the Bankruptcy Court (which may be the Confirmation Order), and the Liquidating Trust Agreement shall have been executed by the Liquidating Trustee; (iii) the GUC Fund shall have been fully funded and released to the Liquidating Trustee upon the Effective Date; and (iv) all other actions and documents determined by the Debtors to be necessary to implement the Plan shall have been effected and executed.

## G.    **Effects of Confirmation**

Binding Effect of Plan.  The provisions of the confirmed Plan shall bind the Debtors, the Liquidating Trust, the Liquidating Trustee, any Entity acquiring property under the Plan, any Beneficiary, and any Creditor or Equity Interest Holder, whether or not such Creditor or Equity Interest Holder has filed a Proof of Claim or Equity Interest in the Chapter 11 Cases, whether or not the Claim of such Creditor or the Equity Interest of such Equity Interest Holder is impaired under the Plan, and whether or not such Creditor or Equity Interest Holder has accepted or rejected the Plan.  All Claims and Debts shall be fixed and adjusted pursuant to the Plan.  The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, or Governmental Unit or parish in which any instrument related to under the Plan or related to any transaction contemplated under the Plan is to be recorded with respect to any taxes of the kind specified in Bankruptcy Code Section 1146(a).

Vesting of Property of Debtors in the Liquidating Trust.  Upon the Effective Date, title to all property of the Estates of the Debtors in the Chapter 11 Cases shall vest in the Liquidating Trust and shall be retained by the Liquidating Trust for the purposes contemplated under the Plan pursuant to the Liquidating Trust Agreement.  Without limiting the generality of the foregoing, all Causes of Action the Debtors hold or may hold against any Entity, Litigation Recoveries, rights to Liquidation Proceeds, and all resulting Liquidating Trust Assets shall vest in the Liquidating Trust upon the Effective Date and shall no longer constitute property of the Estates.

Property Free and Clear.  Except as otherwise provided in the Plan or the Confirmation Order, all property that shall vest in the Liquidating Trust shall be free and clear of all Claims, Equity Interests, Liens, interests, charges, or other encumbrances of Creditors or Interest Holders, other than as set forth in the Plan, in the Liquidating Trust Agreement, and in relevant documents, agreements, and instruments contained in the Plan Supplement.  Following the Effective Date, the Liquidating Trustee may transfer and dispose of any such property free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Rules and without further approval of the Bankruptcy Court or notice to Creditors, except as may otherwise be required under the Plan or the Confirmation Order.

**Exculpation.  The Debtors, the Debtors' officers and directors that served during the Chapter 11 Cases, the Committee, the Committee members, and each of their respective professionals retained during the Chapter 11 Cases (collectively, the "Exculpated Parties"), will neither have nor incur any liability to any entity for any action**

in good faith taken or omitted to be taken between the Petition Date and Effective Date in connection with or related to the Chapter 11 Cases, the sale or other disposition of the Debtors' assets or the formulation, preparation, dissemination, implementation, Confirmation, or Consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan; *provided, however,* that this limitation will not affect or modify the obligations created under the Plan, or the rights of any Holder of an Allowed Claim to enforce its rights under the Plan, and shall not release any action (or inaction) constituting willful misconduct, fraud, or gross negligence (in each case subject to determination of such by final order of a court of competent jurisdiction); *provided* that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan, and such reasonable reliance shall form an absolute defense to any such claim, Cause of Action, or liability. Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections of Section 1125(e) of the Bankruptcy Code.

**Debtors' Release.** Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after and subject to the occurrence of the Effective Date, the Debtors and the Estates shall release (the "Debtor Release") each Released Party, and each Released Party is deemed released by the Debtors and the Estates (provided that the Debtor Release in favor of the ABL Agent, the ABL Lenders and their respective Related Persons is subject to and conditioned upon the release of the GUC Fund to the Liquidating Trustee on the Effective Date) from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors or the Estates, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or the Estates would have been legally entitled to assert in their own right, or on behalf of the Holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' liquidation, the Chapter 11 Cases, the purchase, sale, transfer of any security, asset, right, or interest of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtors and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the Strict Foreclosure Agreement, the Prepetition Strict Foreclosure, the negotiation, formulation, or preparation of the Plan or related agreements, instruments, or other documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on and before the Petition Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct, or gross negligence; provided, that the foregoing Debtor Release shall not operate to waive or release any obligations of any party under the Plan or any other document, instrument, or agreement executed to implement the Plan; and further provided that nothing in the Plan shall act as a discharge of the Debtors.

The "Released Parties" is defined in the Plan as, collectively, (a) the Debtors; (b) the Committee and the individual members thereof in their capacity as such; (c) subject to the release of the GUC Fund to the Liquidating Trust, Lineage; and (d) each of such Entities' Related Persons.  For the avoidance of doubt, the Released Parties include the Debtors' Chief Restructuring Officer and independent director on the Board of Directors of each of the Debtors, as Related Persons of the Debtors (the foregoing category (d)).

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) in the best interests of the Debtors and all Holders of Claims and Interests; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; and (e) a bar to any of the Debtors or the Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.**

**Third Party Release.  On and after and subject to the occurrence of the Effective Date, except as otherwise provided in the Plan, each Claimant (collectively, the "Releasing Parties") who (i) is not Impaired under the Plan or (ii) affirmatively votes to accept the Plan and who does not elect to "opt-out" by marking the appropriate box on such Releasing Party's respective Ballot, for themselves and their respective successors, assigns, transferees, and such Claimants' officers and directors, agents, members, financial and other advisors, attorneys, employees, partners, affiliates, and representatives (in each case in their capacity as such), shall release (the "Third Party Release") each Released Party, and each of the Debtors, the Estates, and the Released Parties shall be deemed released (provided that the Third Party Release in favor of the ABL Agent, the ABL Lenders and their respective Related Persons is subject to and conditioned upon the release of the GUC Fund to the Liquidating Trustee on the Effective Date) from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of any of the Debtors or the Estates, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' liquidation, the Chapter 11 Cases, the purchase, sale, transfer of any security, asset, right, or interest of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtors and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the Strict Foreclosure Agreement, the Prepetition Strict Foreclosure, the negotiation, formulation, or preparation of the Plan or related agreements, instruments, or other documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on and before the Petition Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence. Notwithstanding anything to the**

contrary in the foregoing, the **Third Party Release shall not release any obligations of any party under the Plan or any other document, instrument, or agreement executed to implement the Plan.**

**Injunction.**  **In implementation of the Plan, except as otherwise expressly provided in the Confirmation Order or the Plan, and except in connection with the enforcement of the terms of the Plan or any documents provided for or contemplated in the Plan, all entities who have held, hold or may hold Claims against or Interests in the Debtors, the Liquidating Trust, or the Estates that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtors, the Estates, the Liquidating Trust, the GUC Fund, or any of the Liquidating Trust Assets, with respect to any such Claim or Interest; (b) the enforcement, attachment, collection, or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Debtors, the Estates, the Liquidating Trust, the GUC Fund, or any of the Liquidating Trust Assets with respect to any such Claim or Interest; (c) creating, perfecting, or enforcing, directly or indirectly, any Lien or encumbrance of any kind against the Debtors, the Estates, or the Liquidating Trust, the GUC Fund, or any of the Liquidating Trust Assets with respect to any such Claim or Interest; and (d) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest.  Nothing contained herein shall prohibit the Holder of a timely filed Proof of Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Claimant of any of the obligations of the Debtors or the Liquidating Trust under the Plan.**

Post-Confirmation Liability of Liquidating Trustee.  The Liquidating Trustee, together with its consultants, agents, advisors, attorneys, accountants, financial advisors, other representatives and the professionals engaged by the foregoing (collectively, the "Indemnified Parties") shall not be liable for any and all liabilities, losses, damages, claims, causes of action, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, to the Holders of Claims or Equity Interests for any action or inaction taken in good faith in connection with the performance or discharge of their duties under the Plan, except the Indemnified Parties will be liable for actions or inactions that are grossly negligent, fraudulent, or which constitute willful misconduct (in each case, liability shall be subject to determination by final order of a court of competent jurisdiction).  However, any act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute gross negligence, fraud or willful misconduct.  In addition, the Liquidating Trust and the Estate shall, to the fullest extent permitted by the laws of the State of Delaware, indemnify and hold harmless the Indemnified Parties from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Liquidating Trust and the Estates or the implementation or administration of the Plan if the Indemnified Party acted in good faith and in a manner reasonably believed to be in or not opposed to the best interest of the Liquidating Trust and the Estates.  To the extent the

Liquidating Trust indemnifies and holds harmless the Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Liquidating Trustee in monitoring and participating in the defense of such claims giving rise to the right of indemnification shall be paid as Liquidating Trust Expenses.  All rights of the Persons exculpated and indemnified pursuant hereto shall survive confirmation of the Plan.

## H.    Preservation of Rights of Action

Vesting of Causes of Action.  Except as otherwise provided in the Plan or Confirmation Order, in accordance with Section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtors hold or may hold against any Entity shall vest upon the Effective Date in the Liquidating Trust.

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Liquidating Trustee shall have the exclusive right to institute, prosecute, abandon, settle, or compromise any Causes of Action the Debtors hold or may hold against any Entity, in accordance with the terms of the Liquidating Trust Agreement and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in the Chapter 11 Cases.

Causes of Action and recoveries therefrom shall remain the sole property of the Liquidating Trust, for the ratable benefit of the Beneficiaries of the Liquidating Trust, and holders of Claims shall have no direct right or interest in to any such Causes of Action or recovery.

Preservation of All Causes of Action Not Expressly Settled or Released.  Unless a Cause of Action against a holder of a Claim or other Entity is expressly waived, relinquished, released, compromised, or settled in the Plan an or any Final Order (including the Confirmation Order), the Debtors and the Liquidating Trustee expressly reserve such retained Cause of Action for later adjudication by the Debtors or the Liquidating Trustee (including, without limitation, Causes of Action not specifically identified or described in the Plan Supplement or elsewhere, or of which the Debtors may be presently unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time, or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan, or Confirmation Order, except where such Causes of Action have been released or otherwise resolved by a Final Order (including the Confirmation Order).  In addition, the Debtors and Liquidating Trustee expressly reserve the right to pursue or adopt claims alleged in any lawsuit in which the Debtors are defendants or interested parties against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Subject to the immediately preceding paragraph, any Entity to which the Debtors have incurred an obligation (whether on account of services, the purchase or sale of goods, or otherwise), or that has received services from the Debtors or a transfer of money or property of

the Debtors, or that has received services from the Debtors or a transfer or money or property of the Debtors, or that has transacted business with the Debtors, or that has leased equipment or property from the Debtors, should assume and is hereby advised that any such obligation, transfer, or transaction may be reviewed by the Liquidating Trustee subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether (i) such Entity has filed a proof of claim against the Debtors in the Chapter 11 Cases; (ii) the Debtors or Liquidating Trustee have objected to any such Entity's proof of claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtors or Liquidating Trustee have objected to any such Entity's scheduled Claim; (v) any such Entity's scheduled Claim has been identified by the Debtors or Liquidating Trustee as disputed, contingent, or unliquidated; or (vi) the Debtors have identified any potential claim or Cause of Action against such Entity herein or in the Plan.

**I.      No Discharge**

Nothing contained in the Plan shall be deemed to constitute a discharge of the Debtors under Bankruptcy Code section 1141(d)(3).

**J.      Retention of Jurisdiction**

Following the Confirmation Date, the Bankruptcy Court shall retain jurisdiction as is legally permissible, including, without limitation, for the purposes described in Article IX of the Plan.

**IV.**
**VOTING REQUIREMENTS; ACCEPTANCE AND**
**CONFIRMATION OF THE PLAN**

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that (i) the Plan has classified Claims and Equity Interests in a permissible manner, (ii) the Plan complies with applicable provisions of the Bankruptcy Code, (iii) the Debtors have complied with applicable provisions of the Bankruptcy Code, (iv) the Debtors have proposed the Plan in good faith and not by any means forbidden by law, (v) the disclosure required by Section 1125 of the Bankruptcy Code has been made, (vi) the Plan has been accepted by the requisite votes of creditors (except to the extent that cramdown is available under Section 1129(b) of the Bankruptcy Code), (vii) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, (viii) the Plan is in the "best interests" of all holders of Claims or Equity Interests in an impaired Class by providing such holders on account of their Claims or Equity Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless the Holder has accepted the Plan, and (ix) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on Confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date.

### A.    Parties in Interest Entitled to Vote

Pursuant to the Bankruptcy Code, only classes of claims and interests that are "impaired" (as defined in Section 1124 of the Bankruptcy Code) under the plan are entitled to vote to accept or reject the Plan.  A class is impaired if the legal, equitable, or contractual rights to which the claims or equity interests of that class entitled the holders of such claims or equity interests are modified, other than by curing defaults and reinstating the debt.  Classes of claims and interests that are not impaired are not entitled to vote on the plan and are conclusively presumed to have accepted the plan.  In addition, classes of claims and interests that receive no distributions under the plan are not entitled to vote on the plan and are deemed to have rejected the plan.

### B.    Classes Impaired Under the Plan

Class 2 (ABL Secured Claims), Class 3 (Darden Note Secured Claims), Class 4 (Term Loan Guarantee Claims), Class 6 (Unsecured Claims), Class 7 (Intercompany Claims) and Class 8 (Equity Interests) are Impaired under the Plan.  Acceptances of the Plan are being solicited only from members in Impaired Classes that will or may receive a distribution under the Plan and that are not deemed to have voted for the Plan.  Accordingly, the Debtors are soliciting acceptances from members of Class 2 and Class 6 only.  Class 3 and Class 4 are deemed to vote for the Plan.  Class 7 consents to the Plan.  Class 8 is receiving no distribution under the Plan and is therefore deemed to reject the Plan.

### C.    Voting Procedures and Requirements

In voting for or against the Plan, please use only the Ballot or Ballots sent to you with this Disclosure Statement.  In addition, you may vote to opt out of the releases provided under the Plan to the Released Parties.

If you are a member of Class 2 or Class 6 and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please call Debtors' voting agent, Stretto, at (888) ___-_____.  PLEASE FOLLOW THE DIRECTIONS CONTAINED ON THE ENCLOSED BALLOT CAREFULLY.

YOU SHOULD COMPLETE AND SIGN YOUR BALLOT AND RETURN IT IN THE ENCLOSED ENVELOPE TO:

**Maines Ballot Processing Center**
**c/o _____**
_____
_____

VOTES CANNOT BE TRANSMITTED ORALLY.  FACSIMILE BALLOTS WILL NOT BE ACCEPTED.  TO BE COUNTED, ORIGINAL SIGNED BALLOTS MUST BE RECEIVED ON OR BEFORE _____, 2020, AT 4:00 P.M., PREVAILING EASTERN TIME.  IT IS

OF THE UTMOST IMPORTANCE TO THE DEBTORS THAT YOU VOTE PROMPTLY TO
ACCEPT THE PLAN.

### D.    <u>Confirmation Standards</u>

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan
satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that the
Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy
Code and that they have complied or will have complied with all of the requirements of chapter
11 of the Bankruptcy Code. Specifically, the Debtors believe that the Plan satisfies or will satisfy
the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including
those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.
- The Debtors have complied with the applicable provisions of the Bankruptcy Code.
- The Plan has been proposed in good faith and not by any means forbidden by law.
- Any payment made or to be made under the Plan for services or for costs and expenses
  in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and
  incident to the Chapter 11 Cases, has been or will be disclosed to the Bankruptcy Court,
  and any such payment: (1) made before the confirmation of the Plan is reasonable; or (2)
  is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after
  confirmation of the Plan.
- With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the
  Plan or will receive or retain under the Plan on account of such Claim property of a value
  as of the Effective Date of the Plan that is not less than the amount that such Holder
  would receive or retain if the Debtors were liquidated on that date under chapter 7 of the
  Bankruptcy Code.  With respect to each Class of Interests, each Holder of an Impaired
  Interest has accepted the Plan or will receive or retain under the Plan on account of such
  Interest property of a value as of the Effective Date of the Plan that is not less than the
  amount that such Holder would receive or retain if the Debtors were liquidated on that
  date under chapter 7 of the Bankruptcy Code.
- Each Class of Claims or Interests that is entitled to vote on the Plan has either accepted
  the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the
  approval of such voting Class of Claims or Interests pursuant to section 1129(b) of the
  Bankruptcy Code.
- Except to the extent that the Holder of a particular Claim will agree to a different
  treatment of its Claim, the Plan provides that Holders of Claims specified in section
  507(a)(2) will receive, without interest, Cash equal to the Allowed amount of such Claim:
  (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date
  upon which the Bankruptcy Court enters a Final Order determining or approving such
  Claim; (b) in accordance with the terms and conditions of agreements between the Holder
  of such Claim and the Debtors or the Liquidating Trustee, as the case may be; (c) with
  respect to any Claims representing obligations incurred in the ordinary course of the
  Debtors' business, upon such regular and customary payment or performance terms as
  may exist in the ordinary course of the Debtors' business or as otherwise provided in the

Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), such fees will be paid as and when due under applicable law.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that the Liquidating Trustee shall pay Holders of Claims specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code the full unpaid amount of such Allowed Claim on the earliest of the following dates:  (i) on or as soon as practicable after the Effective Date, (ii) on or as soon as practicable after the date such Claim becomes an Allowed Claim, and (iii) the date such Allowed Claim is payable under applicable non-bankruptcy law.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization.

- The Debtors have paid or the Plan provides for the payment of the required fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

## E.    **Best Interests Test**

In order to confirm the Plan, the Bankruptcy Court must independently determine that the Plan is in the best interests of each Holder of a Claim or Equity Interest in any such impaired Class who has not voted to accept the Plan.  Accordingly, if an Impaired Class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such member would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on such date.

## F.    **Liquidation Analysis**

In this case, the Debtors have sold substantially all of their assets, resulting in approximately $_____, including the GUC Fund, in net liquidation and other proceeds available for distribution to creditors in accordance with the Plan.  As discussed further below, the GUC Fund, provided by Lineage under the Plan, would **not** be able for distribution to general unsecured creditors of the Debtors in a Chapter 7 proceeding.  Lineage agreed to fund the $2 million GUC Fund provided that the Plan (or other acceptable Chapter 11 plan) was approved as set forth in and subject to the Strict Foreclosure Agreement.  Based upon the Debtors' current projections, Holders of Allowed Administrative, Priority and Secured Claims will be paid in full under the Plan, while Holders of Allowed Unsecured Claims will receive a projected distribution of approximately ____% to ____%.

If the Chapter 11 Cases were converted to Chapter 7 cases, first and foremost, the Estates would not have the benefit of the $2 million GUC Fund being gifted by Lineage to provide a recovery for general unsecured creditors under the Plan, and thus, general unsecured creditors would likely receive no recovery in a Chapter 7 proceeding.  Further, the Debtors' estates would

incur the costs of payment of a statutorily allowed commission to the Chapter 7 trustee, as well as the costs of counsel and other professionals retained by the trustee.  The Debtors believe that such amounts would exceed the amount of expenses that will be incurred in implementing the Plan and winding up the affairs of the Debtors in the Chapter 11 Cases.  The Debtors contemplate an orderly administration and winding down of the Estates by parties that are already familiar with the Debtors, their assets and affairs, and their creditors and liabilities.  Such familiarity will allow the Liquidating Trust to complete liquidation of the remaining assets (including prosecution of Causes of Action), and distribute the net proceeds to creditors more efficiently and expeditiously than a Chapter 7 trustee.  Additionally, the Estates would suffer additional delays, as a Chapter 7 trustee and his/her counsel took time to develop a necessary learning curve in order to complete the administration of the Estates (including the prosecution of Causes of Action).  Also, a new time period for the filing of claims would commence under Bankruptcy Rule 1019(2), possibly resulting in the filing of additional Claims against the Estates.

Based upon the foregoing, the Debtors believe that creditors will receive at least as much or more under the Plan than they would receive if the Chapter 11 Cases were converted to Chapter 7 cases.

## G.   Feasibility

Under Section 1129(a)(11) of the Bankruptcy Code, the Debtors must show that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan).  The Plan clearly complies with this requirement because all of the Debtors' remaining assets will be liquidated or otherwise disposed of and the proceeds thererof will be distributed to creditors pursuant to the terms of the Plan.  Furthermore, feasibility under Section 1129(a)(11) is supported by the liquidation analysis in Article IV, Section F, of this Disclosure Statement.

## H.   Acceptance by Impaired Classes

Bankruptcy Code § 1129(b) provides that a plan can be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of claims has accepted it. The process by which nonaccepting classes are forced to be bound by the terms of a plan is commonly referred to as "cramdown."  The Bankruptcy Court may confirm the Plan at the request of the Debtors notwithstanding the Plan's rejection (or deemed rejection) by impaired Classes as long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted it.  A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A class of claims under a plan accepts the plan if the plan is accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims in the class that actually vote on the plan.  A class of interests accepts the plan if the plan is accepted by

holders of interests that hold at least two-thirds in amount of the allowed interests in the class that actually vote on a plan.

A class that is not "impaired" under a plan is conclusively presumed to have accepted the plan. Solicitation of acceptances from such a class is not required. A class is "impaired" unless (1) the legal, equitable and contractual rights to which a claim or interest in the class entitles the holder are not modified, or (2) the effect of any default is cured and the original terms of the obligation are reinstated.

A plan is fair and equitable as to a class of secured claims that rejects the plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the liens securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, at least equal to the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim, or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

AS CLASS 8 EQUITY INTERESTS ARE DEEMED TO REJECT THE PLAN, THE DEBTORS INTEND TO SEEK CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE WITH RESPECT TO SUCH CLASS. FURTHER, THE DEBTORS WILL REQUEST CONFIRMATION OF THE PLAN UNDER SECTION 1129(B) WITH RESPECT TO ANY OTHER IMPAIRED CLASS ENTITLED TO VOTE ON THE PLAN THAT DOES NOT ACCEPT THE PLAN.

I.      **Compliance with the Applicable Provisions of the Bankruptcy Code**

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. The Debtors have considered each of these issues in the development of the Plan and believes that the Plan complies with all applicable provisions of the Bankruptcy Code.

## V.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords Holders of Claims the potential for the maximum distribution on account of their claims and, therefore, is in the best interests of such Holders. If the Plan is not confirmed, the only viable alternatives are dismissal of the Chapter 11 Cases or conversion to Chapter 7 of the Bankruptcy Code. For the reasons described herein, neither of these alternatives is preferable to confirmation and consummation of the Plan.

If the Chapter 11 Cases were dismissed, creditors would revert to a "race to the courthouse," the result being that creditors would not receive a fair and equitable distribution of the Debtors' remaining assets. Moreover, as set forth above, the Debtors believe the Plan provides a greater recovery to creditors than would be achieved in a Chapter 7 case. Therefore, a Chapter 7 case is not an attractive or superior alternative to the Plan. Thus, the Plan represents the best available alternative for maximizing returns to creditors.

## VI.

## RISK FACTORS

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED AND ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

## A.      Risks Relating to Confirmation and Consummation of the Plan

### 1.      Parties in Interest May Object to Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be confirmed or consummated.

### 2.      The Debtors May Object to a Claim or Equity Interest

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Equity Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is or may become subject to an objection, counterclaim or other suit by the Debtors.  Thus, any Holder of a Claim or Equity Interest that is or may become subject to an objection may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 3.      The Debtors May Fail to Satisfy the Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims or Equity Interests as those proposed in the Plan.

### 4.      Plan May Not Be Accepted, Confirmed or Consummated

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, findings by the bankruptcy court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of Claims

within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or Equity Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes, or the Plan contains other terms disapproved of by the Bankruptcy Court.

The Debtors reserve the right to modify the terms and conditions of the Plan as necessary for confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan. Section 1127 of the Bankruptcy Code permits the Debtors to modify the Plan at any time before confirmation, but not if such modified Plan fails to meet the requirements for confirmation. The Debtors may modify the Plan at any time after confirmation of the Plan and before substantial consummation of the Plan if circumstances warrant such modification and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, but not if such modified Plan fails to meet the requirements for confirmation. The Debtors will comply with the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code with respect to the modified Plan. Any Holder of a Claim or Equity Interest that has accepted or rejected the Plan is deemed to have accepted or rejected, as the case may be, the Plan as modified, unless, within the time fixed by the Bankruptcy Court, such Holder changes its previous acceptance or rejection.

5.      **Non-Consensual Confirmation of the Plan May Be Necessary**

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class) ("Accepting § 1129(a)(10) Class") and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. If there is an Accepting § 1129(a)(10) Class, the Debtors believe that the Plan satisfies these other requirements and the Debtors may request such non-consensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, in the event that a Voting Class does not accept the Plan, there can be no assurance that the Bankruptcy Court will reach this conclusion.

**B.**    **Risks Relating to the Chapter 11 Process**

    1.    **The Debtor's Exclusivity Period May Terminate**

At the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtors will have retained the exclusive right to propose the Plan upon filing their petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' goals.

    2.    **Continuation of the Chapter 11 Cases May Harm the Debtors' Estates**

A prolonged continuation of the Chapter 11 Cases may adversely affect the Debtors' Estates.  So long as the Chapter 11 Cases continue, the Debtors may be required to incur substantial costs for professional fees and other expenses associated with the proceedings.

    3.    **The Chapter 11 Cases May Be Converted to Cases Under Chapter 7**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than liquidating in a controlled manner through the Liquidating Trust and (b) additional administrative expenses involved in the appointment of a chapter 7 trustee.

**C.**    **Risks Relating to Recoveries Under the Plan**

The projected distributions set forth in this Disclosure Statement are based upon the Debtors' good-faith estimate of the amount of expenses that will be incurred and total amount of Claims in each Class that will ultimately be Allowed.  The actual amount of such expenses could be greater than expected for a variety of reasons, including greater than anticipated administrative and litigation costs associated with resolving Disputed Claims.  Additionally, the actual amount of Allowed Claims in any class could be greater than anticipated, which would impact the distributions to be made to Holders of Claims.

# VII.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THE FOLLOWING IS INTENDED TO BE ONLY A SUMMARY OF SELECTED FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH, AND RECEIPT OF TAX ADVICE FROM, A TAX PROFESSIONAL. THE SELECTED FEDERAL TAX CONSEQUENCES THAT ARE DESCRIBED HEREIN AND OTHER FEDERAL, STATE AND LOCAL TAX CONSEQUENCES THAT ARE NOT ADDRESSED HEREIN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH TAX CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST. ACCORDINGLY, EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST IS STRONGLY ADVISED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN. THE BELOW SUMMARY OF TAX CONSEQUENCES IS NOT INTENDED TO BE AND IS NOT TAX ADVICE.

THE DEBTORS DO NOT INTEND TO REQUEST A TAX RULING FROM THE INTERNAL REVENUE SERVICE OR ANY OTHER TAXING AUTHORITY WITH RESPECT TO ANY OF THE TAX CONSEQUENCES OF THE PLAN. CONSEQUENTLY, THE INTERNAL REVENUE SERVICE OR ANOTHER TAXING AUTHORITY MAY DISAGREE WITH AND MAY CONTEST ONE OR MORE OF THE TAX CONSEQUENCES DESCRIBED HEREIN TO THE DEBTOR, HOLDERS OF CLAIMS AND HOLDERS OF INTERESTS.

A.   **Federal Income Tax Consequences to Certain Creditors**

   1.   **In General**

Generally, a holder of a Claim should in most, but not all, circumstances recognize gain or loss equal to the difference between the "amount realized" by such holder in exchange for its Claim and such holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a holder's Claim. The tax basis of a holder in a Claim will generally be equal to the holder's cost therefor. To the extent applicable, the character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the Claim in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period of the Claim, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the holder's hands, any gain or loss realized will generally be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the holder has held such Claim for more than one year.

A creditor who received Cash in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A creditor who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as interest, regardless of whether such creditor realizes an overall gain or loss as a result of surrendering its Claim. A creditor who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such creditor realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.

Under the Plan, the holders of certain Claims, including Unsecured Claims in Class 6, will likely receive only a partial distribution of their Allowed Claims. Whether the applicable holder of such Claims will recognize a loss or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the holder and its Claims. Creditors should consult their own tax advisors.

2.      **Non-United States Persons**

A holder of a Claim that is a Non-U.S. Person generally will not be subject to U.S. federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (i) such holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for United States federal income tax purposes, or (ii) if such holder is an individual, such holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

3.      **Tax Consequences in Relation to Liquidating Trust**

As of the Effective Date, the Liquidating Trust will be established for the benefit of the holders of certain Allowed Claims. The tax consequences of the Plan in relation to the Liquidating Trust and the beneficiaries thereof are subject to uncertainties due to the complexity of the Plan and the lack of interpretative authority regarding certain changes in the tax law.

Allocations of taxable income of the Liquidating Trust (other than taxable income allocable to the Liquidating Trust's claims reserves) among holders of Claims will be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all of its assets (valued at their tax book value) to the holders of the beneficial interests in the Liquidating Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining trust assets.

The tax book value of the trust assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements. Uncertainties with regard to federal income tax consequences of the Plan may arise due to the inherent nature of estimates of value that will impact tax liability determinations.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an IRS private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee may (a) elect to treat any trust assets allocable to, or retained on account of, Disputed Claims (the "Trust Claims Reserve") as a "disputed ownership fund" governed by Treasury Regulation Section 1.468B-9, and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, any Trust Claims Reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the trust assets in such reserves, and all distributions from such reserves will be treated as received by holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Liquidating Trustee and the holders of beneficial interests in the Liquidating Trust) will be required to report for tax purposes consistently with the foregoing.

The Liquidating Trust is intended to qualify as a liquidating trust for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994.28 I.R.B. 124, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidating Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan and Liquidating Trust Agreement, and in conformity with Revenue Procedure 94-45, supra, all parties (including the Liquidating Trustee and the holders of beneficial interests in the Liquidating Trust) are required to treat for federal income tax purposes, the Liquidating Trust as a grantor trust of which the holders of the applicable Allowed Claims are the owners and grantors. While the following discussion assumes that the Liquidating Trust would be so treated for federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust as a grantor trust. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Liquidating Trust and the beneficiaries thereof could materially vary from those discussed herein.

In general, each creditor who is a beneficiary of the Liquidating Trust will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such beneficiary in satisfaction of its applicable Allowed Claim, and (ii) such beneficiary's adjusted tax basis in such Claim. The "amount realized" by a beneficiary will equal the sum of cash and the aggregate fair market value of the property received by such party pursuant to the Plan (such as a beneficiary's undivided beneficial interest in the assets transferred to the Liquidating Trust). Where gain or loss is recognized by a beneficiary in respect of its Allowed Claim, the character

of such gain or loss (*i.e.*, long-term or short-term capital, or ordinary income) will be determined by a number of factors including the tax status of the party, whether the Claim constituted a capital asset in the hands of the party and how long it had been held, whether the Claim was originally issued at a discount or acquired at a market discount and whether and to what extent the party had previously claimed a bad debt deduction in respect of the Claim.

After the Effective Date, any amount that a creditor receives as a distribution from the Liquidating Trust in respect of its beneficial interest in the Liquidating Trust should not be included, for federal income tax purposes, in the party's amount realized in respect of its Allowed Claim, but should be separately treated as a distribution received in respect of such party's beneficial interest in the Liquidating Trust.

In general, a beneficiary's aggregate tax basis in its undivided beneficial interest in the assets transferred to the Liquidating Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date and the beneficiary's holding period in such assets will begin the day following the Effective Date. Distributions to any beneficiary will be allocated first to the original principal portion of the beneficiary's Allowed Claim as determined for federal tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.

For all federal income tax purposes, all parties (including the Liquidating Trustee and the holders of beneficial interests in the Liquidating Trust) will treat the transfer of assets to the Liquidating Trust, in accordance with the terms of the Plan and Liquidating Trust Agreement, as a transfer of those assets directly to the holders of the applicable Allowed Claims followed by the transfer of such assets by such holders to the Liquidating Trust. Consistent therewith, all parties will treat the Liquidating Trust as a grantor trust of which such holders are to be owners and grantors. Thus, such holders (and any subsequent holders of interests in the Liquidating Trust) will be treated as the direct owners of an undivided beneficial interest in the assets of the Liquidating Trust for all federal income tax purposes. Accordingly, each holder of a beneficial interest in the Liquidating Trust will be required to report on its federal income tax return(s) the holder's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the Liquidating Trust.

The Liquidating Trust's taxable income will be allocated to the holders of beneficial interests in the Liquidating Trust in accordance with each such holder's *pro rata* share. The character of items of income, deduction and credit to any holder and the ability of such holder to benefit from any deductions or losses may depend on the particular situation of such holder.

The federal income tax reporting obligation of a holder of a beneficial interest in the Liquidating Trust is not dependent upon the Liquidating Trust distributing any cash or other proceeds. Therefore, a holder of a beneficial interest in the Liquidating Trust may incur a federal income tax liability regardless of the fact that the Liquidating Trust has not made, or will not make, any concurrent or subsequent distributions to the holder. If a holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it

in respect of its beneficial interests in the Liquidating Trust it holds, the holder may be allowed a subsequent or offsetting loss.

The Liquidating Trustee will file with the IRS returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a).  The Liquidating Trust will also send to each holder of a beneficial interest in the Liquidating Trust a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct the holder to report such items on its federal income tax return.

Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, could also change the federal income tax consequences of the Plan and the transactions contemplated thereunder.

## B.     **Information Reporting and Backup Withholding**

Distributions pursuant to the Plan will be subject to any applicable federal income tax reporting and withholding.  The IRC imposes "backup withholding" on certain "reportable" payments to certain taxpayers, including payments of interest.  Under the IRC's backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional federal income tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of income tax.  A holder of a Claim may be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

### VIII.

### **RECOMMENDATION**

The Debtors strongly recommend that all creditors receiving a Ballot vote in favor of the Plan.  The Debtors believe that the Plan is in the best interests of creditors.  The Plan as structured, among other things, allows creditors with Allowed Claims to participate in distributions believed to be in excess of those that would otherwise be available were the Chapter 11 Cases dismissed or converted under Chapter 7 of the Bankruptcy Code and minimizes delays in recoveries to creditors.

FOR ALL THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT, THE DEBTORS BELIEVE THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES.  THE DEBTORS URGE ALL CREDITORS ENTITLED TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY 4:00 P.M. EASTERN STANDARD TIME ON _____, 2020.


Dated:  June 11, 2020                    By: /s/ John C. DiDonato_____
                                             John C. DiDonato
                                             Chief Restructuring Officer of
                                             Maines Paper and Food Service, Inc.
                                             And Affiliated Debtors

# EXHIBIT A

# (THE PLAN)

# EXHIBIT B

# (ORGANIZATIONAL CHART)



**Corporate Organization Chart[1]**

Maines Paper & Food Service, Inc.

Maines Funding Corporation

Maines Paper & Food Service– Chicago, Inc.

Maines Paper & Food Service– Dallas, Inc.

Maines Paper & Food Service– Great Lakes, Inc.

Maines Paper & Food Service– Maryland, Inc.

Maines Paper & Food Service– Tennessee, Inc.

Maines Paper & Food Service– Worcester, Inc.

Warehouse & Logistics, Inc.

Maines Paper & Food Service– Mid-Atlantic, Inc.

Maines Paper & Food Service– New England Inc.

Maines Paper & Food Service– NY Metro, Inc.

Maines Paper & Food Service– Ohio, Inc.

[1] Non-debtor Maines Endicott Holdings, LLC and its wholly owned non-debtor subsidiary, Huron Real Estate Associates, LLC are not listed in this chart

DOCS_LA:329251.9 54433/001